Argued and submitted July 31, affirmed October 4, appellant's petition for
reconsideration filed November 22 allowed by opinion December 27, 2006
See 210 Or App 176, 149 P3d 1251 (2006)

# STATE OF OREGON,
*Appellant,*

*v.*

# LES L. MILLER,
*Respondent.*

## 03CR0968; A127389

144 P3d 1052

Steven R. Powers, Assistant Attorney General, argued the cause for appellant. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Jamesa J. Drake, Deputy Public Defender, argued the cause for respondent. With her on the brief were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Rosenblum, Judge.

HASELTON, P. J.

## HASELTON, P. J.

In this criminal prosecution involving a charge of possession of a controlled substance, *former* ORS 475.992 (2003),[1] the state moved *in limine* on the morning of trial to have the court determine the admissibility of two lab reports prepared by employees of the Oregon State Police Forensic Laboratory (OSP lab) that the state wished to introduce into evidence without calling the authors of those reports as witnesses. The trial court agreed with defendant that, in light of *Crawford v. Washington*, 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004), the reports were "inadmissible without the live testimony of the forensic scientist, or criminalist or analyst who prepared the reports." The trial court further concluded, parenthetically, that ORS 475.235, which permits evidence of such reports to be admitted without live testimony from the authors under certain circumstances, is unconstitutional. The state appeals, arguing that the trial court was wrong in both respects. As explained below, although we agree with the state that ORS 475.235, as interpreted by the Oregon Supreme Court in *State v. Hancock*, 317 Or 5, 854 P2d 926 (1993), is constitutional, we conclude that the trial court nonetheless was correct in its ruling on the state's motion *in limine*. We therefore affirm.

None of the pertinent facts is in dispute. In January 2003, criminalist Kenn Meneely of the OSP lab prepared a report, in which defendant was denominated as a suspect, that stated, in pertinent part, that toxicological examination of a urine specimen that had been collected from defendant on December 21, 2002, confirmed the presence of methamphetamine. The report concluded: "I certify this to be my report concerning my laboratory tests on the evidence in the above identified case." On April 4, 2003, forensic scientist Rob Hilsenteger of the OSP lab prepared a report, naming defendant as a suspect, that stated that a glass smoking device with white residue in it had tested positive for methamphetamine. That report concluded that Hilsenteger "does hereby certify this to be a true copy of the original report." Both reports were addressed to the Grants Pass police

---

[1] Similar provisions are currently codified at ORS 475.840 to 475.920.

department. In December 2003, defendant was indicted for possession of methamphetamine, a controlled substance, in Josephine County, Oregon. *Former* ORS 475.992 (2003).

Before trial, the prosecutor first assigned to the case represented to defense counsel that the prosecution would call the authors of the lab reports as witnesses. The prosecutor also listed Meneely as a witness on a status report filed with the court.

The week before trial, a new prosecutor was assigned the case. On the day scheduled for trial, that prosecutor moved *in limine* to admit the two OSP lab reports without live testimony from the authors of the reports. She explained that she had only just discovered "the potential for *Crawford* issues" in the case and had determined that Hilsenteger would not be available for trial because he had left the OSP lab. She indicated that Meneely, although still working for the lab, had not been subpoenaed for that day. The following exchange took place:

> "THE COURT: So you're saying had you been aware of *Crawford* or reviewed the file earlier you would have had him under subpoena?
>
> "[PROSECUTOR]: Yes, I would have, Your Honor. Yes, I would have. If I had reviewed the file earlier I would have asked for him to be notified of the hearing, if he was not going to be available we would not have declared ready at the time of docket."

Defense counsel noted that she was not told until the previous day that the state would not call the authors of the reports as witnesses, and stated that she was raising objections based on the Confrontation Clauses of the state and federal constitutions, as well as *Hancock*, because she did not have a chance to subpoena the authors of the reports: "And if I had known that this issue was going to come up I would have subpoenaed them."

The prosecutor argued that, although she would have subpoenaed the witnesses had she discovered the *Crawford* issues earlier, their testimony nonetheless was not constitutionally required because the lab reports were "non-testimonial evidence" for purposes of *Crawford*. She thus

moved to admit the reports despite the unavailability of their authors. The trial court ruled that the lab reports did constitute "testimonial evidence" under *Crawford*. The court concluded:

"I feel that *State v. Hancock* does not apply in this case in that it's clear that the defendant was notified that these witnesses would be testifying, at least Mr. Meneely. And Mr. Meneely perhaps could have sufficed to—by familiarizing himself with the records in the other issue, the testing of the pipe and some pinkish crystals, perhaps could have sufficed there. But, it's really kind of—my main ruling is on *Crawford* and its effect on this kind of testimony, this kind of evidence.

"So for that reason I am going to rule that this is inadmissible without—the State's Exhibit 1 and 2 is inadmissible without the live testimony of the forensic scientist, or criminalist or analyst who prepared the reports."

The court ultimately entered an order stating that "having found that lab reports are testimonial in nature, that *Crawford v. Washington* applies, ORS 475.235 is unconstitutional based on *Crawford*, and therefore lab tests will not be allowed in evidence in this case."

The state appeals. *See* ORS 138.060; *State v. Koennecke*, 274 Or 169, 545 P2d 127 (1976) (state may appeal pretrial order excluding evidence pursuant to ORS 138.060). The state makes two related arguments: First, the state argues that the trial court erred in ruling that the reports were inadmissible because *Hancock* is controlling in this situation, and the reports were admissible under *Hancock*.[2] Second, the state asserts that, even if *Hancock* is called into question by *Crawford*, the reports are "non-testimonial" under *Crawford* and, thus, admissible.

Although we ultimately reach both of the state's arguments, we turn to its second argument first, as the trial court's ruling was predicated on its conclusion that the

---

[2] We note, at this point, that the parties on appeal incorrectly assume that the trial court ruled on a *defense* motion to exclude the reports. The record reveals, however, that the court's ruling was on the *state's* motion to admit the reports without the testimony of the authors. Although the point is a minor one, it has some bearing on our disposition of the appeal.

reports were "testimonial" under *Crawford*. The court's premise in *Hancock* was that "[d]efendant has the [Sixth Amendment] *right to confront* the criminalist" who prepares a report pursuant to ORS 475.235. *Hancock*, 317 Or at 12 (emphasis added). We thus address the issues in the same order as did the trial court: First, does *Crawford* call into question the court's conclusion in *Hancock* that a defendant has a Sixth Amendment right to cross-examine the authors of reports such as those at issue in the present case? Or, put another way, are the reports "non-testimonial" evidence? Second, if the reports are "testimonial," should the court have admitted the reports under *Hancock*, which held that a defendant's right to confront witnesses is not compromised when, under ORS 475.235, "the state will call the criminalist if the defendant elects to have it do so"? *Hancock*, 317 Or at 11.

In *Crawford*, the question was whether statements made by the defendant's wife during an interview with police officers could be admitted into evidence under a hearsay exception without giving the defendant an opportunity to cross-examine the wife. *Crawford*, 541 US at 38. Abandoning its previous "firmly rooted hearsay exception" and "particularized guarantees of trustworthiness" test concerning when hearsay evidence would be admitted, the Court held that, when evidence was "testimonial," the defendant had a right to confront witnesses. The Court emphasized that the Confrontation Clause was meant to curb the practice of using evidence of "*ex parte* examinations" against defendants. *Id.* at 50. The Court continued:

> "The text of the Confrontation Clause reflects this focus. It applies to 'witnesses' against the accused—in other words, those who 'bear testimony.' 1 N. Webster, An American Dictionary of the English Language (1828). 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.

"Various formulations of this core class of 'testimonial' statements exist: '*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' Brief for Petitioner 23; 'extrajudicial statements * * * contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' *White v. Illinois*, 502 US 346, 365, 116 L Ed 2d 848, 112 S Ct 736 (1992) (Thomas, J., joined by Scalia, J., concurring in part and concurring in judgment); 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' Brief for National Association of Criminal Defense Lawyers et al. at *Amicus Curiae* 3. These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction[.]"

*Id.* at 51-52 (brackets and ellipses in original). That "common nucleus," the Court concluded, was that the statements involved were "testimonial." Although the Court did not attempt to define the full scope of what statements would be considered "testimonial," it did specify some types of statements that were: "*ex parte* testimony at a preliminary hearing" and "[s]tatements taken by police officers in the course of interrogations[.]" *Id.* at 52.

After *Crawford* was decided, we rejected a defendant's unpreserved argument that admission of lab reports concerning the presence of controlled substances in his urine violated his right to confrontation under the Sixth Amendment, on the ground that any error did not qualify as "plain error." *State v. Thackaberry*, 194 Or App 511, 515, 95 P3d 1142 (2004), *rev den*, 338 Or 17 (2005). We stated:

"Is there a reasonable dispute as to whether a laboratory report of the results of a toxicology test performed on a urine sample is testimonial hearsay? *Crawford* tells us that the distinction between testimonial and nontestimonial hearsay is all-important. But *Crawford* does little to aid us in determining when hearsay falls into the testimonial category. Expressly, the Court identified as 'testimonial hearsay' prior *testimony* at a preliminary hearing, before a

grand jury, or at a former trial. [541 US at 68.] * * * A laboratory report of a toxicology test performed on a urine sample neither qualifies as, nor seems analogous to, testimony at a preliminary hearing, before a grand jury, or at a former trial. Nor, at least in any obvious way, is it a statement made during a 'police interrogation' or closely analogous to one. On the other hand, a laboratory report may be analogous to—or arguably even the same as—a business or official record, which the Court in *Crawford* suggested *in dictum* would not be subject to its holding."

*Id.* at 515-16 (emphasis in original).[3] We concluded that we did not need to decide "whether the report is or is not testimonial in nature. The question before us, for purposes of the plain error analysis, is only whether the legal point is open to reasonable dispute." *Id.* at 516. We concluded that the legal point was open to reasonable dispute.

The Oregon Supreme Court also has examined a *Crawford* issue, in the context of determining the admissibility of out-of-court statements made by a child to a DHS worker who questioned the child at the request of the police. *State v. Mack*, 337 Or 586, 101 P3d 349 (2004). In concluding that the evidence was "testimonial," the court noted, in particular, three things. First, that the caseworker elicited information from the child on behalf of the police. *Id.* at 594. Second, that the interview of the child was structured in such a way as "to elicit information from [the child] relevant to the police investigation." *Id.* And, third, that the out-of-court statements were elicited by governmental officials "for use in criminal trials." *Id.*

---

[3] The *dictum* to which we referred was a portion of the opinion that responded to a dissenting view:

"This is not to deny, as the Chief Justice notes, that '[t]here were always exceptions' to the general rule of exclusion' of hearsay evidence. [541 US at 73 (Rehnquist, C. J., dissenting).] Several had become well established by 1791. See 3 Wigmore § 1397, at 101; Brief for United States as *Amicus Curiae* 13, n 5. But there is scant evidence that exceptions were invoked to admit *testimonial* statements against the accused in a *criminal* case. Most of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy. We do not infer from these that the Framers thought exceptions would apply even to prior testimony."

*Crawford*, 541 US at 56 (footnote omitted; emphasis in original).

Subsequently, this court addressed Sixth Amendment Confrontation Clause concerns in the context of certifications as to the accuracy of Intoxilyzer machines in *State v. Norman*, 203 Or App 1, 125 P3d 15 (2005), *rev den*, 340 Or 308 (2006). In *Norman*, the defendant was arrested for driving under the influence of intoxicants and submitted to a breath test on an Intoxilyzer machine, which showed a blood alcohol content above the legal limit. *Id.* at 3. The state offered into evidence documents certifying that the Intoxilyzer machine had been tested for accuracy approximately one month before the defendant was given the test, and again approximately one month after. The defendant objected that the certificates constituted "testimonial" evidence under *Crawford*, and that he had a right to confront the technicians who prepared the certificates. *Id.* at 5. We disagreed:

> "[T]he certifications in this case do not resemble the classic kind of testimonial evidence at which the Confrontation Clause was aimed—*ex parte* examination of witnesses intended to be used to convict a particular defendant of a crime. Rather, the certifications are evidence about the accuracy of a test result arrived at by a machine. They were created by state employees in the course of carrying out routine ministerial duties required by statute and administrative rule to certify the accuracy of test results of Intoxilyzer machines. The first certification occurred before defendant was arrested, and the second occurred 45 days after his arrest and four months before his trial in June 2003. Rather than being directed at evidence about the accuracy of a machine result, the Confrontation Clause is directed at the methodology of *ex parte* police or prosecutorial examinations of potential witnesses, those who make a solemn declaration or affirmation of fact to government officers for the purpose of establishing or proving a fact in issue in the case being prosecuted."

*Id.* at 6-7. We went on to note that the Court in *Crawford* suggested that numerous hearsay exceptions were, by their nature, not "testimonial," including " 'for example, business records or statements in furtherance of a conspiracy.' " *Id.* at 8 (quoting *Crawford*, 541 US at 56). Because the certifications at issue in *Norman* were, essentially, business or public

records, we reasoned, they were not testimonial in nature. 203 Or App at 8.

The Court further elaborated on "testimonial statements" in its recent case, *Davis v. Washington / Hammon v. Indiana*, \_\_\_ US \_\_\_ , 126 S Ct 2266, 165 L Ed 2d 224 (2006) (*Davis / Hammon*). In *Davis / Hammon*, the Court considered whether statements made by victims of domestic violence qualified as testimonial. In *Davis*, the victim had spoken with a 9-1-1 operator during the course of being assaulted and provided identifying information about her attacker. \_\_\_ US at \_\_\_ , 126 S Ct at 2271. In *Hammon*, a neighbor had reported a domestic disturbance and, when officers came to investigate, the victim told them that nothing was the matter and the defendant told them everything was fine. The officers then questioned the two separately and elicited information from the victim that the defendant had hit her. *Id.* at \_\_\_ , 126 S Ct at 2272. In both cases, the victims did not testify and their statements were admitted into evidence over the defendants' Confrontation Clause objections. The Court concluded:

> "Without attempting to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.[1]

---

"[1] Our holding refers to interrogations because, as explained below, the statements in the cases presently before us are the products of interrogations—which in some circumstances tend to generate testimonial responses. This is not to imply, however, that statements made in the absence of any interrogation are necessarily nontestimonial. The Framers were no more willing to exempt from

cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation. (Part of the evidence against Sir Walter Raleigh was a letter from Lord Cobham that was plainly *not* the result of sustained questioning. *Raleigh's Case*, 2 How St Tr 1, 27 (1603)). And of course even when interrogation exists, it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate."

*Id.* at ____, ____ n 1, 126 S Ct at 2273-74, 2274 n 1 (emphasis in original). Ultimately, the Court concluded that statements made by the victim in *Davis* about events "as they were actually happening," concerning a "present emergency," *id.*, were not testimonial. *Id.* at ____, 126 S Ct at 2276. Statements by the victim in *Hammon*, on the other hand, were more akin to the statements ruled testimonial in *Crawford*, in that they described past events. *Id.* There, no emergency existed and "the interrogation was part of an investigation into possibly criminal past conduct." *Id.* at ____, 126 S Ct at 2278.

In the present case, the state relies heavily on our statements made in *Thackaberry*, quoted above, 208 Or App at 430-31, for its assertion that the lab reports are not "testimonial." In particular, the state posits that the lab reports are not "testimonial" because they are akin to business records that the Court suggested in *dictum* in *Crawford* might not be "testimonial."

We begin by reiterating the context of our statement in *Thackaberry*. The threshold issue in *Thackaberry*—which ultimately proved to be the only issue in that case—was whether the asserted unpreserved error was error apparent on the face of the record. ORAP 5.45. Consequently, our discussion pertained solely to whether any legal error concerning the admissibility of lab reports was a matter reasonably in dispute. *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991). Indeed, we expressly disclaimed any determination of the merits, *Thackaberry*, 194 Or App at 516, reserving that determination for the future.

The future is now. In this case, we are squarely presented with the question whether lab reports such as those at

issue here are "testimonial" for purposes of Sixth Amend-ment analysis. We conclude that they are, in light of the Court's recent decision elaborating on *Crawford*.

As noted above, although *Crawford* did not provide any definitive description of "testimonial" evidence, the Court's later decision in *Davis/Hammon* provided additional guidance, as does our decision in *Norman*. *Davis/Hammon* concerned statements made in the course of police "interro-gation." Here, by contrast, there was no police "interrogation" as that word is commonly used. We can presume, however, that the reports *were*, in fact, produced in response to a police *inquiry*. That is, the OSP crime lab prepared the reports and sent them to the police department because the police wanted to know whether the evidence that had been collected revealed the presence of controlled substances. As such, the reports do have some similarities to statements offered in response to questioning by police officers. And, as the Court noted in *Davis/Hammon*, "[t]he Framers were no more will-ing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation." ___ US at ___ n 1, 126 S Ct at 2274 n 1.

■■ In *Davis/Hammon*, the Court classified as "nontes-timonial" statements that were made in the course of police interrogation under circumstances objectively indicating that the "primary purpose was to enable police assistance to meet an ongoing emergency." *Id.* at ___ , 126 S Ct at 2277. Conversely, it classified as "testimonial" statements made when "there is no such ongoing emergency, and * * * the pri-mary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecu-tion." *Id.* at ___ , 126 S Ct at 2273-74. The statements made in the lab reports at issue here are clearly intended to be used in a criminal prosecution to prove past events—the presence of controlled substances in defendant's urine at a specific time in the past and the presence of drug residue on a glass smoking device. As we stated in *Norman*, the Confrontation Clause is directed at "those who make a solemn declaration or affirmation of fact to government officers for the purpose of

establishing or proving a fact in issue in the case being prosecuted." 203 Or App at 7. The lab reports at issue here are solemn declarations or affirmations of fact, made to the police department that requested the results, for the purpose of establishing or proving a fact in issue in this criminal prosecution, *i.e.*, the presence of controlled substances in defendant's urine and in a glass smoking device. The lab reports thus constitute testimonial evidence.

In so holding, it is important to revisit one aspect of our discussion in *Thackaberry*, in which we suggested that "a laboratory report may be analogous to—or arguably even the same as—a business * * * record, which the Court in *Crawford* suggested *in dictum* would not be subject to its holding." *Thackaberry*, 194 Or App at 516. On reflection, we now believe that the Court in *Crawford*, in suggesting that records under the business records exception of the hearsay rule would not be considered "testimonial," did not have in mind the type of record at issue here, *viz.*, a lab report prepared for use against a criminal defendant in a specific criminal prosecution. That is so because such a record did not fit the common-law exception for business records that would have been familiar to the framers of the Sixth Amendment.

The modern "business record" exception to the codified hearsay rules evolved from what was known at common law as the "shop book rule." In *Palmer v. Hoffman*, 318 US 109, 63 S Ct 477, 87 L Ed 645, *reh'g den*, 318 US 800 (1943), the Court construed a federal statute[4] that significantly expanded the shop book rule.[5] *Id.* at 111-12. The Court

---

[4] The statute at issue in *Palmer* has many similarities to modern FRE 803(6) and OEC 803(6), which are generally known as "business records" exceptions to hearsay rules.

[5] One of the leading cases tracing the history of the common-law shop book rule in the United States is an Oregon case. *See* John Henry Wigmore, 5 *Evidence* § 1518 n 1 (3d ed 1940) (citing *Radtke v. Taylor*, 105 Or 559, 210 P 863 (1922)). In *Radtke*, the court stated:

"The American shop-book rule has been based upon the ground of necessity. There were many small merchants who kept their own books and did not employ clerks or a bookkeeper; and since the parties to lawsuits were disqualified as witnesses, such merchants were nearly always without any available evidence to prove sales made by them on credit. Out of this necessity arose a rule permitting the use of a party's shop-books as evidence of goods sold and services rendered."

*Id.* at 571. The court went on to note that one version of the shop book rule evolved before the American Revolution based on Dutch law practice in New York, under

recited some of the legislative history of the statute that expanded the shop book rule, which related the requirements that the bookkeeping notations be identified by the book-keeper who had made the entries. The Court noted that Congress was concerned about situations in which big businesses with many bookkeepers making entries by machine would not be able to identify the specific bookkeeper who made a particular entry. *Palmer,* 318 US at 112. The Court held, however, that the statute, while addressing that concern, did not change the fundamental nature of the hearsay exception, *viz.,* that the record in question be made in the "systematic conduct of the business as a business." *Id.* at 113.

The Court proceeded to consider the particular record at issue in *Palmer*—a report made by a railroad engineer concerning an accident that had occurred in the course of his work several days earlier. *Id.* at 111. The Court rejected the argument that the accident report fit within the hearsay exception:

"[T]he fact that a company makes a business out of recording its employees' versions of their accidents does not put those statements in the class of records made 'in the regular course' of the business within the meaning of the Act. If it did, then any law office in the land could follow the same course, since business as defined in the Act includes the professions. We would then have a real perversion of a rule designed to facilitate admission of records which experience has shown to be quite trustworthy. Any business by installing a regular system for recording and preserving its version of accidents for which it was potentially liable could qualify those reports under the Act. The result would be that the Act would cover any system of recording events or

which "merchants and traders" could "always exhibit their books in evidence, where it was acknowledged or proved that there had been a dealing between the parties, or that the articles had been delivered, provided they were regularly kept with the proper distinction of persons, things, year, month and day." *Id.* at 572 (internal quotation marks and citations omitted). Another form of the shop book rule, described in *Radtke* as the "New England" form, was that "books of accounts kept by a party himself were received in evidence when supported by his suppletory oath[.]" *Id.* at 574-75. Under that version of the rule, the records were submitted "to the court for inspection, and if they did not appear to be a register of the daily business of the party and to have been honestly and fairly kept, they were rejected." *Id.* at 575 (citations omitted). Thus, it is clear that the shop book rule hearsay exception arose in the context of civil disputes concerning debts and had no obvious application in the context of criminal law.

occurrences provided it was 'regular' and though it had little or nothing to do with the management or operation of the business as such. Preparation of cases for trial by virtue of being a 'business' or incidental thereto would obtain the benefits of this liberalized version of the early shop book rule. The probability of trustworthiness of records because they were routine reflections of the day to day operations of a business would be forgotten as the basis of the rule. Regularity of preparation would become the test rather than the character of the records and their earmarks of reliability acquired from their source and origin and the nature of their compilation. We cannot so completely empty the words of the Act of their historic meaning. If the Act is to be extended to apply not only to a 'regular course' of a business but also to any 'regular course' of conduct which may have some relationship to business, Congress not this Court must extend it. *Such a major change which opens wide the door to avoidance of cross-examination should not be left to implication.*"

*Id.* at 113-14 (citations omitted; emphasis added). The Court thus rejected the admission of the accident report as falling within the expanded version of the common-law shop book rule:

"Unlike payrolls, accounts receivable, accounts payable, bills of lading and the like *these reports are calculated for use essentially in the court, not in the business. Their primary utility is in litigating*, not in railroading."

*Id.* at 114 (emphasis added).

■      In light of the scope of the common-law shop book rule as described above, we conclude that a lab report that is prepared by staff at a state crime laboratory at the request of police for use in a criminal prosecution of a specific defendant would not fall within the shop book rule exception as the framers of the United States Constitution would have understood it. Indeed, it would not even fall within the expanded version of the rule enacted by Congress in 1936 and interpreted by the Court in *Palmer*, because its primary utility is in litigating, not in the day-to-day running of a crime lab. *Cf. Lepire v. MVD*, 47 Or App 67, 76, 613 P2d 1084 (1980) (analyzing case law concerning what types of police reports can constitute business records, and concluding that those held

admissible were those that were not prepared "with a view toward their use in litigation to prove the issue for which they were offered"). In sum, and contrary to our suggestion in *Thackaberry*, the lab reports here are not the sort of "business records" referred to in the *Crawford dictum*. 541 US at 56. The trial court properly concluded that the lab reports constituted "testimonial" evidence.

We turn to the state's alternative argument, that is, that even if the lab reports are "testimonial" for Confrontation Clause purposes, *Hancock* remains good law after *Crawford* and the reports are admissible under ORS 475.235 as construed in *Hancock*. In *Hancock*, the court considered the constitutionality of ORS 475.235, which permits the state to introduce into evidence certain lab reports without presenting live testimony from the criminalists who authored the reports, unless the defendant elects to have the criminalist testify. The defendant in *Hancock* argued that ORS 475.235 violated the Confrontation Clauses of both state and federal constitutions, because it allowed for the admission of lab reports without the testimony of the criminalists. 317 Or at 7. The court, relying on *State v. Mai*, 294 Or 269, 656 P2d 315 (1982), concluded that the exercise of constitutional rights could be premised on "reasonable procedures" that a defendant must follow in order to exercise that constitutional right. *Hancock*, 317 Or at 10. The court concluded that ORS 475.235 provided such a reasonable procedure:

"A factual scenario helps to make our point. Suppose that the district attorney said to a defendant, before trial, 'Must I bring in my criminalist? I'll do it, if you wish. But you know what the contents of his reports are. You know if you intend to cross-examine him or not. Here's what I propose: If you want to cross-examine the criminalist, I'll have him here. If you don't, will you stipulate to my using the report instead. * * * That'll save us some time and let you concentrate on other areas of the case.' * * *

"This statute is a legislative decision to make what amounts to the same offer on behalf of the prosecutor in *every* such case. A defendant is told by the statute that the state will let the defendant select the method by which the state will prove the nature of the controlled substance that is involved in the case. The statute's offer to allow the

defendant to procure the criminalist as a witness at no charge is just another way of saying that the state will call the criminalist if the defendant elects to have it do so. When the statute is read in this way, there is no confrontation clause problem to discuss."

*Hancock*, 317 Or at 10-11 (emphasis in original). Thus, *Hancock* proceeds from the premise that a defendant has a Sixth Amendment right to confront the preparers of such lab reports. *Id.* at 12. Nothing in *Crawford* or in *Davis / Hammon* calls into question that premise.[6] Rather, as explained above, they confirm that premise.

■ Defendant argues, however—and the trial court apparently agreed, although it did not explain its reasoning—that *Hancock* is irreconcilable with *Crawford*. Defendant suggests that ORS 475.235, which requires a defendant to affirmatively elect to have the state put on testimony by the criminalist in order to secure the opportunity to cross-examine the authors of lab reports, impermissibly imparts a "presumption of reliability" as to the reports, and thus violates the Sixth Amendment. We find nothing in *Crawford*, nor in the later *Davis / Hammon* case, that calls into question the Oregon Supreme Court's conclusion in *Hancock* that the exercise of rights under the Confrontation Clause may be premised on a defendant following "reasonable procedures" to exercise those rights. In sum, *Hancock* remains controlling law. ORS 475.235, as interpreted and applied in *Hancock*, is constitutional.

The only remaining question is how *Hancock* applies here. The state's position on appeal assumes that *defendant* moved to *exclude* the reports. That is incorrect. As noted above, 208 Or App at 428 n 2, the *prosecutor* sought to have the reports *admitted* without defendant being afforded any opportunity to cross-examine the authors of the reports. That is, the original prosecutor had assured defense counsel that the authors of the reports would be subpoenaed—and, when

---

[6] Defendant argues that *Hancock* was, in fact, premised on the analysis of *Ohio v. Roberts*, 448 US 56, 100 S Ct 2531, 65 L Ed 2d 597 (1980), which the Court overruled in *Crawford*. We reject without further discussion defendant's contention as entirely unsupported by the court's analysis. *See Hancock*, 317 Or at 8-9, 12 (expressly declining to address parties' arguments concerning *Ohio v. Roberts* and instead concluding that the defendant "has the right to confront the criminalist").

that did not occur due to prosecutorial error, the prosecutor at trial advanced an argument that live testimony was not necessary because the reports were "nontestimonial hearsay" under *Crawford*. Not only was the state's argument incorrect under *Crawford*, as explained above, but it violated *Hancock*'s directives that, under ORS 475.235, "defendant [may] select the method by which the state will prove the nature of the controlled substance that is involved in the case," and "the state *will* call the criminalist if the defendant elects to have it do so." 317 Or at 11 (emphasis added).

■         Defendant, in this case, *did* elect to have the state call the authors of the lab reports.[7] The state did not do so. Accordingly, the trial court correctly determined, on the state's motion *in limine,* that the reports would not be admitted into evidence without testimony from the authors of the reports.

Affirmed.

---

[7] The text of ORS 475.235 may well indicate that such an election involves having the defendant subpoena the authors of the reports (which did not happen here) although the court's decision in *Hancock* suggests that the witnesses must testify as part of the state's case rather than as part of defendant's case. In light of the undisputed fact that the prosecutor here caused defense counsel to believe that the prosecutor would be calling the authors, and defense counsel stated that she would have subpoenaed the authors had she known that the state would attempt to introduce their reports without live testimony, we have no doubt that, had the state argued to the trial court that defendant was required to subpoena the authors pursuant to ORS 475.235, the court would have granted a continuance for defense counsel to do so.