Derry District Court
No. 2006-013

# THE STATE OF NEW HAMPSHIRE

### v.

# BRIAN T. O'MALEY

Argued: April 5, 2007
Opinion Issued: September 5, 2007

*Kelly A. Ayotte*, attorney general (*Susan P. McGinnis*, assistant attorney general, on the brief and orally), for the State.

*Paul J. Garrity*, of Londonderry, on the brief and orally, for the defendant.

DALIANIS, J. Following a bench trial in Derry District Court (*Coughlin*, J.), the defendant, Brian T. O'Maley, was convicted of driving while under

the influence of intoxicating liquor (DWI). *See* RSA 265:82 (2004); RSA 265:82-b (Supp. 2006). We affirm.

*I. Background*

The record supports the following: On August 1, 2005, the then-seventeen-year-old defendant was driving his father's vehicle on Mammoth Road in Derry, when he crashed into a telephone pole and mailbox post, injuring his head and damaging the vehicle. The Londonderry police found the defendant and a severely damaged vehicle at his parents' home. The two officers who spoke with him testified that they detected an odor of alcohol emanating from him and that he said that he had been drinking and driving. Eventually, the police arrested the defendant for DWI and transported him by ambulance to a hospital for treatment.

At the hospital, an officer reviewed an administrative license suspension form with the defendant and his parents. The defendant signed the form and agreed to have blood drawn for an alcohol concentration test. A medical technician then drew the blood sample and completed a blood sample collection form. The form indicated the technician's name, title and employer, identified the non-alcoholic cleanser used on the area from which the blood was taken, and stated that the technician had withdrawn a blood sample from the defendant "for the purpose of analysis as authorized under RSA 265:85, I, and in accordance with Administrative Rule He-P 2202." *See* RSA 265:90, IV (2004); *see also* N.H. ADMIN. RULES, Saf-C 6402.2 (formerly N.H. ADMIN. RULES, He-P 2202).

The officer then took the blood sample to the police department, where it was placed in a refrigerated locker. *See* N.H. ADMIN. RULES, Saf-C 6402.6. On August 5, 2005, the sample was taken to the state police forensic laboratory in Concord, where, on August 16, 2005, an analyst tested it. *See* N.H. ADMIN. RULES, Saf-C 6402.07-6402.10. Dr. Michael Wagner, the assistant laboratory director, reviewed the test results to ensure that both the sample and results complied with applicable administrative rules, and calculated the reported value of the blood test results. *See* N.H. ADMIN. RULES, Saf-C 6402.11, 6402.12, 6402.14. Dr. Wagner testified that the final report, which he prepared, showed that the defendant's blood alcohol content was .14 grams per one hundred milliliters or "a .14." Neither the technician who drew the blood nor the analyst who originally tested it testified at trial.

On appeal, the defendant argues that by allowing the blood sample collection form and Dr. Wagner's testimony about the blood test results to be admitted at trial, the trial court violated his rights under the State and Federal Confrontation Clauses. He also asserts that admitting Dr. Wagner's testimony about the blood test results into evidence was error

because the State failed to show that his blood was collected and tested in accord with applicable regulations.

*II. Compliance with Administrative Regulations*

"Because we decide cases upon constitutional grounds only when necessary," *State v. Wall*, 154 N.H. 237, 244 (2006), we begin with the defendant's assertion that the trial court erred when it admitted Dr. Wagner's testimony about the blood test results into evidence because the State failed to demonstrate that the blood was collected and tested in compliance with applicable regulations.

"Generally, we accord considerable deference to a trial court's evidentiary rulings and will only intervene when they demonstrate an unsustainable exercise of discretion." *State v. Belton*, 150 N.H. 741, 743, *cert. denied*, 543 U.S. 674 (2004). Under this standard of review, we review only whether "the record establishes an objective basis sufficient to sustain the discretionary judgment made." *State v. Lambert*, 147 N.H. 295, 296 (2001). "Unless a party establishes that such a ruling was clearly untenable or unreasonable to the prejudice of the party's case, it will not be disturbed." *Belton*, 150 N.H. at 743.

RSA 265:85, IV (2004) provides, in pertinent part, "No tests of blood . . . authorized by RSA 265:84 shall be considered as evidence in any proceeding before any administrative officer or court unless such test is performed in accordance with methods prescribed by the commissioner of the department of safety."

■ The defendant asserts that because the people who collected and tested his blood did not testify, the State failed to prove that the collection and testing satisfied applicable regulations. To the contrary, with respect to collecting his blood, RSA 265:90, IV permits the State to satisfy its burden of proof by submitting the blood sample collection form. This statute provides:

> A copy of the appropriate form filled out and signed by the person who took the sample for the alcohol concentration test in question shall be admissible evidence that the sample was taken by such person at the stated time on the stated date according to the procedures prescribed in the rules adopted by the commissioner of the department of safety pursuant to RSA 265:85, V.

By submitting the blood sample collection form, the State sufficiently proved that the defendant's blood was collected in compliance with

applicable regulations. *See* RSA 265:90, IV; *see also* N.H. ADMIN. RULES, Saf-C 6402.02.

With respect to testing the blood, Dr. Wagner testified that certain qualifying tests were run before the sample was tested to ensure that the test results met applicable State regulations. He also testified that the administrative rules promulgated by the New Hampshire Department of Safety regarding how blood samples must be handled and tested have been incorporated into how the laboratory processes the sample. He further testified that these regulations were followed with respect to the defendant's blood sample.

For instance, New Hampshire Administrative Rules, Saf-C 6402.09 sets forth the requirements pertaining to blood tests for alcohol concentration. It requires that a blood sample submitted for determination of alcohol concentration be tested by gas chromatography. N.H. ADMIN. RULES, Saf-C 6402.09. It also sets forth the various steps in the process by which a blood sample must be tested. *See id.* Upon review of the analyst's notes at trial, Dr. Wagner testified that all of these steps had been completed. Dr. Wagner's testimony also indicated that the analyst recorded all of the information related to the testing of the defendant's blood sample that is required by New Hampshire Administrative Rules, Saf-C 6402.10.

■ Whatever deficiencies or weaknesses there might have been in the State's proof of compliance with the regulations "affect[ed] the weight of the evidence but [did] not determine its admissibility." *State v. Caswell*, 146 N.H. 243, 246 (2001) (quotation omitted). Accordingly, we conclude that the trial court did not err by admitting the blood test results on the ground that the State failed to prove that the collection and the testing of the blood complied with pertinent regulations.

*III. Harmless Error*

■ We next address the State's assertion that any error in admitting the blood sample collection form and Dr. Wagner's testimony about the blood test results constituted harmless error. It is well settled that an error is harmless only if it is determined, beyond a reasonable doubt, that the verdict was not affected by the error. *State v. Pseudae*, 154 N.H. 196, 202 (2006). The State bears the burden of proving that an error is harmless. *Id.* An error may be harmless beyond a reasonable doubt if the alternative evidence of a defendant's guilt is of an overwhelming nature, quantity or weight and if the inadmissible evidence is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt. *Id.* In making this determination, we consider the alternative evidence

presented at trial as well as the character of the inadmissible evidence itself. *Id.* We hold that the State has failed to establish harmless error.

■ "[T]o prove the defendant guilty of driving while intoxicated, the State was required to prove beyond a reasonable doubt that the defendant drove or attempted to drive a vehicle upon a way while he was under the influence of intoxicating liquor." *State v. Wiggin,* 151 N.H. 305, 308-09 (2004) (quotation omitted); *see* RSA 265:82, I. "To prove that the defendant was under the influence of intoxicating liquor, the State need only prove impairment to any degree." *Wiggin,* 151 N.H. at 309 (quotations omitted).

The alternative evidence of the defendant's guilt included the following: The defendant was involved in a single-car accident and admitted to having been drinking and driving. The officer who first responded to the scene detected a strong odor of alcohol coming from his person. Another officer who responded sometime later testified that she also smelled alcohol on the defendant's person.

On the other hand, both officers testified that the defendant was not swaying. One of the officers also testified that the defendant's eyes did not appear to be red or glassy. Moreover, the defendant was not asked to complete any field sobriety tests.

■ Given this record, we cannot conclude that the admission of the blood sample collection form and Dr. Wagner's testimony about the blood test results was harmless beyond a reasonable doubt. *See State v. Lorton,* 149 N.H. 732, 73335 (2003). The alternative evidence of the defendant's guilt was not so overwhelming that the blood sample collection form and blood test results were merely cumulative or inconsequential. *See Pseudae,* 154 N.H. at 202.

### IV. Constitutional Issues

Because we are unable to resolve this appeal on non-constitutional grounds, we next address the defendant's claims under the State and Federal Confrontation Clauses.

#### A. State Constitution

We begin with the State's argument that the defendant has not preserved his State Confrontation Clause argument. To trigger a state constitutional analysis, an appellant must: (1) raise the state constitutional issue in the trial court; and (2) specifically invoke a State constitutional provision in his or her brief. *State v. MacElman,* 154 N.H. 304, 310 (2006). Because the defendant has failed to demonstrate that he raised a state constitutional issue in the trial court, we conclude that he has not preserved his State Confrontation Clause argument for appellate review.

*See State v. Dellorfano*, 128 N.H. 628, 633 (1986). We, therefore, decline to consider his State Confrontation Clause argument and limit our review to his claims under the Federal Confrontation Clause.

## B. Federal Constitution

The Sixth Amendment to the Federal Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." Relying upon *Crawford v. Washington*, 541 U.S. 36, 68 (2004), the defendant asserts that admitting the blood sample collection form and Dr. Wagner's testimony about the blood test results, absent the testimony of those who withdrew and tested his blood or proof of their unavailability and his opportunity for prior cross-examination, violated his rights under the Federal Confrontation Clause. *See* U.S. CONST. amends. VI, XIV.

### 1. Crawford and Davis

Before *Crawford*, the United States Supreme Court had ruled that admitting certain out-of-court statements did not violate the Confrontation Clause provided that they bore "adequate indicia of reliability." *Ohio v. Roberts*, 448 U.S. 56, 66 (1980) (quotation omitted). "Reliability [could] be inferred without more in a case where the evidence [fell] within a firmly rooted hearsay exception," or bore "particularized guarantees of trustworthiness." *Id.*; *see State v. Ayer*, 154 N.H. 500, 505 (2006), *petition for cert. filed* (U.S. Apr. 26, 2007) (No. 06-11028).

In *Crawford*, the court overruled *Roberts*, holding that out-of-court testimonial statements are inadmissible under the Federal Confrontation Clause unless the witness is unavailable at trial and the defendant had a prior opportunity to cross-examine him or her. *Crawford*, 541 U.S. at 68. As the court explained, "Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.'" *Id.* at 61.

The crucial determination under *Crawford* as to whether an out-of-court statement violates the Confrontation Clause is whether it is "testimonial" or not. *Id.* at 51; *see Davis v. Washington*, 126 S. Ct. 2266, 2273 (2006). Only "testimonial" statements cause a declarant to be a "witness" within the meaning of the Confrontation Clause. *Davis*, 126 S. Ct. at 2273. A witness, explained the court in *Crawford*, is a person who "bear[s] testimony." *Crawford*, 541 U.S. at 51 (quotation omitted). "Testimony, in turn, is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* (quotations

omitted). Thus, "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.*

The Court observed that there were "[v]arious formulations" of the "core class of 'testimonial' statements," which included: (1) *"ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; (2) "extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 51-52 (quotations and ellipsis omitted).

Although the Court set forth these formulations, "[it] found it unnecessary to endorse any of them, because some statements qualify under any definition." *Davis*, 126 S. Ct. 2273 (quotations omitted). Thus, the Court ruled that "[w]hatever else the term [testimonial] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68. These kinds of statements, the Court reasoned, were "testimonial" under any definition of the term. *See id.* at 52, 68. They have the "closest kinship to the abuses at which the Confrontation Clause was directed." *Id.* at 68. "[T]he principal evil at which the Confrontation Clause was directed," explained the Court, "was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations [conducted by judicial officers] as evidence against the accused." *Id.* at 50. "It was these practices that the Crown deployed in notorious treason cases like [Sir Walter] Raleigh's . . . [and] that the founding-era rhetoric decried." *Id.* at 50.

At issue in *Crawford* was the admissibility of a recorded statement that the petitioner's wife had made while in police custody. *Id.* at 38, 65. "In response to often leading questions from police detectives, she implicated [the petitioner] in [a] stabbing and at least arguably undermined his self-defense claim." *Id.* at 65. The Court likened this statement to *ex parte* testimony admitted against a criminal defendant, and ruled that its admission had violated the petitioner's rights under the Confrontation Clause. *Id.* at 66, 69. This statement, the Court observed, "knowingly given in response to structured police questioning, qualifie[d] [as testimonial] under any conceivable definition." *Id.* at 53 n.4.

In *Davis*, the Court further clarified that, despite language in *Crawford*, *see id.* at 68, arguably indicating otherwise, not all statements made during police interrogation are "testimonial." *See Davis*, 126 S. Ct. at 2273. The Court explained that the kind of interrogation it had in mind when it decided *Crawford* was one "solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator." *Id.* at 2276.

██ Whether statements during a police interrogation are "testimonial," the *Davis* Court explained, depends upon the circumstances under which they were given. *See id.* at 2273, 2276-79; *see also People v. Geier*, 161 P.3d 104, 137 (Cal. 2007). Only those statements that are made "when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution," are testimonial. *Davis*, 126 S. Ct. at 2273-74. By contrast, "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id.* at 2273.

*Davis* involved two consolidated cases, both involving responses by victims of domestic violence to police inquiries. In the first, *Davis v. Washington*, a woman made a 911 call while in the midst of a domestic disturbance with her former boyfriend. *Davis*, 126 S. Ct. at 2270-71. She described the attack while it was occurring and answered other questions. *Id.* at 2271. When the police arrived within four minutes of the call, they found her in a "shaken state," with "fresh injuries," frantically trying to gather her belongings. *Id.* (quotation omitted). At the assailant's trial, the victim did not appear and the tape of her 911 call was admitted into evidence. *Id.*

In the second case, *Hammon v. Indiana*, police responded to a report of a domestic disturbance, and found the victim alone on the front porch. *Id.* at 2272. While appearing "somewhat frightened," she told the police that "nothing was the matter." *Id.* (quotations omitted). After learning from the defendant that he and the victim had had an argument, the police questioned the victim and then had her fill out and sign an affidavit in which she alleged that the defendant had physically assaulted her. *Id.* At the defendant's trial, the victim did not appear and her affidavit and oral statements to the police were admitted into evidence. *Id.* at 2272-73.

The Court ruled that the interrogation that took place during the 911 call did not produce testimonial statements, while the interrogation in *Hammon* did. *Id.* at 2276-79. The Court found that the statements made

during the 911 call were not testimonial because: (1) the victim was speaking about events as they were actually happening, rather than describing past events; (2) any reasonable listener would recognize that the victim was facing an ongoing emergency; (3) the statements were necessary to resolve the ongoing emergency, rather than to learn what had happened in the past; and (4) the victim was answering questions frantically, in an environment that was neither tranquil nor safe. *Id.* at 2276-77. These circumstances, the Court explained, indicated that the "primary purpose" of the interrogation was to "enable police assistance to meet an ongoing emergency." *Id.* at 2277. In this context, the victim "simply was not acting as a *witness*; she was not *testifying*. What she said was not a weaker substitute for live testimony at trial." *Id.* (quotation omitted).

By contrast, the statements that were the product of the *Hammon* interrogation were testimonial, the Court ruled, because: (1) the interrogation was part of an investigation into possible criminal past conduct; (2) there was no emergency in progress; and (3) the officer questioning the victim was not seeking to determine what was happening, but what had happened. *Id.* at 2278. These circumstances, objectively viewed, showed that the "primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime." *Id.* The victim's statements "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed" and were given some time after the events described were over. *Id.* "Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial." *Id.*

### 2. Determining Whether Statement is Testimonial

Although we have not yet had occasion to decide whether documents such as the blood sample collection form and laboratory tests such as the blood tests upon which Dr. Wagner based his testimony are "testimonial," courts in other jurisdictions have. We look to their decisions for guidance.

In the wake of *Crawford* and *Davis*, "some courts have adopted a bright line test based on language in [*Crawford*] about the availability of the out-of-court statements for later trial and concluded that this is the defining characteristic of whether such statements are testimonial." *Geier*, 161 P.3d at 134. "Thus, these courts conclude[] that because such evidence—fingerprint analysis, autopsy reports, serology reports, drug analysis reports, DNA reports—is prepared for possible use at a criminal trial it is testimonial and inadmissible unless the conditions for its admission, outlined in *Crawford*, have been met." *Id.*; *see State v. Caulfield*, 722

N.W.2d 304, 309-10 (Minn. 2006) (laboratory report identifying substance seized as cocaine); *State v. Renshaw*, 915 A.2d 1081, 1087 (N.J. Super. Ct. App. Div. 2007) (blood sample certification); *State v. Miller*, 144 P.3d 1052, 1058 (Or. Ct. App. 2006) (laboratory report showing presence of drugs in defendant's urine).

Other courts have developed a different bright line test based upon dicta in *Crawford* regarding business records. In *Crawford*, the Court noted that when the Federal Constitution was drafted, "[m]ost of the hearsay exceptions covered statements that by their nature were not testimonial— for example, business records or statements in furtherance of a conspiracy." *Crawford*, 541 U.S. at 56. Some courts have seized upon this to rule that laboratory reports and the like are not testimonial because they constitute business records. *See People v. Hinojos-Mendoza*, 140 P.3d 30, 37 (Colo. Ct. App. 2005) (laboratory report), *cert. granted*, 2006 WL 2338141 (Colo. Aug. 14, 2006); *Com. v. Verde*, 827 N.E.2d 701, 705 (Mass. 2005) (drug certificate of analysis); *State v. Forte*, 629 S.E.2d 137, 14344 (N.C.) (DNA analysis), *cert. denied*, 127 S. Ct. 557 (2006); *State v. Dedman*, 102 P.3d 628, 636 (N.M. 2004) (blood test results); *State v. Craig*, 853 N.E.2d 621, 638 (Ohio 2006) (autopsy reports), *cert. denied*, 127 S. Ct. 1374 (2007); *State v. Norman*, 125 P.3d 15, 19 (Or. Ct. App. 2005) (breath test machine certification), *review denied*, 132 P.3d 28 (Or. 2006).

Neither test persuades us as each rests upon a misinterpretation of *Crawford*. While *Crawford* mentioned whether a statement was "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" as one formulation of the core class of statements with which the Confrontation Clause was concerned, *Crawford*, 541 U.S. at 52 (quotation omitted), it did not endorse this formulation. *Davis*, 126 S. Ct. at 2273; *see State v. Carter*, 114 P.3d 1001, 1007 (Mont. 2005). Following *Davis*, "it cannot be that a statement is testimonial in every case where a declarant reasonably expects that it might be used prosecutorially." *United States v. Ellis*, 460 F.3d 920, 926 (7th Cir. 2006). If this were so, the victim's statements to the 911 operator would have been testimonial because "[a] reasonable person reporting a domestic disturbance" to a 911 operator, like the victim in *Davis*, "will be aware that the result is the arrest and possible prosecution of the perpetrator." *Id.*; *see also Geier*, 161 P.3d at 139.

Nor can it be that all statements that qualify as business records are nontestimonial *per se*. *See Thomas v. United States*, 914 A.2d 1, 13 (D.C. 2006), *petition for cert. filed* (U.S. June 28, 2007) (No. 07-5053). The *Crawford* dicta related to the business record exception that existed when the Federal Constitution was drafted, not that which currently exists. *See id.* As the court in *Thomas* explained:

As an historical matter, the exception in 1791 was a very narrow one. In *Crawford*, the Supreme Court found no evidence that the historical business records exception (or any other historical exception apart from that for dying declarations) ever had been invoked to admit *testimonial* statements against the accused in a *criminal* case, nor any indication that the Framers thought it could be so used. Traditionally, the historical business records exception did not encompass records prepared for use in litigation, let alone records produced *ex parte* by government agents for later use in criminal prosecutions.

*Id.* at 13 (citations and quotation omitted).

We find the opinion of the California Supreme Court in *Geier* instructive. One of the issues in *Geier*, a capital murder case, was whether the State's expert could rely upon DNA test results to formulate her opinion that the defendant's DNA and that extracted from one of the victims matched even though the expert did not run the tests herself and the analyst who ran them did not testify. The defendant asserted that the DNA report, which formed the basis of the expert's testimony, was testimonial because it was "made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Geier*, 161 P.3d at 134 (quotation omitted); *see Crawford*, 541 U.S. at 52. The California Supreme Court disagreed. *Geier*, 161 P.3d at 140.

While it "found no single analysis of the applicability of *Crawford* and *Davis* to the kind of scientific evidence at issue ... to be entirely persuasive," the court was "more persuaded by those cases concluding such evidence is not testimonial." *Id.* at 138. Based upon its interpretation of *Crawford* and *Davis*, it ruled that to be testimonial, a statement must be: (1) made to a law enforcement officer or agent; and (2) describe a past fact related to criminal activity for possible use at a later trial. *Id.*

The court ruled that the DNA test results, upon which the expert relied, were not testimonial under these criteria. *Id.* at 140. Most importantly, the analyst who conducted the DNA test "recorded her observations regarding the DNA samples, her preparation of the samples for analysis, and the results of that analysis as she was actually performing those tasks." *Id.* at 139. Like the victim in *Davis*, when she made these observations, she was neither acting as a witness nor testifying. *Id.*; *see Ellis*, 460 F.3d at 926-27. To the California Supreme Court, whether "the statement represents the contemporaneous recordation of observable events" is the "crucial point." *Geier*, 161 P.3d at 140.

Further, the court interpreted *Davis* as requiring it to consider the circumstances under which the out-of-court statement was made to determine whether it is testimonial. *Id.* These circumstances, the court ruled, further indicated that the DNA test results were not testimonial. *Id.* The analyst who generated the report and notes did so "as part of a standardized scientific protocol." *Id.* Further, she did so "as part of her job, not ... to incriminate [the] defendant." *Id.* Moreover, merely recounting the procedures she used was not "accusatory." *Id.* Her report of laboratory protocols and the resulting raw data were "neutral, having the power to exonerate as well as convict." *Id.* (quotation omitted). Finally, the accusatory opinions "were reached and conveyed not through the nontestifying technician's laboratory notes and report, but by the testifying [expert] witness." *Id.* Under these circumstances, the analyst did not "bear witness" against the defendant. *Id.*

Additionally, the court specifically rejected the bright line rule that makes testimonial any statement that it might be reasonably anticipated will be used at trial. *Id.* Following *Davis*, the court explained, this cannot be the law. *See id.* "*Davis* confirms that the critical inquiry is not whether it might be reasonably anticipated that a statement will be used at trial but the circumstances under which the statement was made." *Id.*

Ultimately, like the California Supreme Court, we too have not found any single analysis of *Crawford* and *Davis* to be "entirely persuasive." *Id.* at 138. We are especially unpersuaded by tests that rest, nearly exclusively, upon one factor, such as whether an objective witness would reasonably believe the statement would be available for use at trial or whether it constitutes a business record. While bright line tests may be easy to administer and "bring[] clarity and predictability," *Roell v. Withrow*, 538 U.S. 580, 596 (2003) (Thomas, J., dissenting), we believe that the Court's decision in *Davis* requires a case-by-case approach. *See Davis*, 126 S. Ct. at 2277-78; *see also People v. Stechly*, 870 N.E.2d 333, 363 (Ill. 2007) (*Crawford* and *Davis* make clear that determining whether statement is testimonial must be made on a case-by-case basis); *cf. United States v. Brito*, 427 F.3d 53, 61 (1st Cir. 2005) (decided before *Davis*) (determining whether statements made during 911 call are testimonial "require an ad hoc, case-by-case approach"), *cert. denied*, 126 S. Ct. 2983 (2006).

"Like other courts which have considered the issue of what makes a statement testimonial, we believe it would be fruitless to attempt to provide an exhaustive list of factors which may potentially enter into the 'testimonial' calculus and the weight to be accorded them." *Stechly*, 870 N.E.2d at 363. "Each case must be resolved on its own merits, and a pertinent factor in one case may not carry much weight in another." *Id.*

■ However, we agree with the court in *Geier* that the circumstances under which an out-of-court statement is generated is the "critical inquiry." *Geier*, 161 P.3d at 140. We also agree that a crucial factor in determining whether a statement is testimonial or not is whether it represents "the documentation of past events" or "the contemporaneous recordation of observable events." *Id.* at 139; *see Davis*, 126 S. Ct. at 2278.

■ We believe that two other factors are also important; the first is whether the statement was prepared in a manner resembling *ex parte* examination. *See Michels v. Com.*, 624 S.E.2d 675, 680 (Va. Ct. App. 2006). In *Crawford*, this referred to "the historical practice of justices of the peace or other court officials questioning witnesses, *ex parte*, and then merely reading the witnesses' statements into evidence." *Bohsancurt v. Eisenberg*, 129 P.3d 471, 477 (Ariz. Ct. App. 2006). The justices of the peace who conducted these examinations "were not magistrates as we understand that office today, but had an essentially investigative and prosecutorial function." *Crawford*, 541 U.S. at 53.

The second factor we believe is important is whether the statement is an accusation. *See* 30A C. WRIGHT & K. GRAHAM, FEDERAL PRACTICE AND PROCEDURE § 6371.2, at 42, § 6371.3, at 207 (Supp. 2007); *see also Michels*, 624 S.E.2d at 680. "*Crawford* emphasized that a principal aim of the Confrontation Clause is to protect a criminal defendant from accusations of criminal wrongdoing." *Michels*, 624 S.E.2d at 680. Moreover, given the use of the word "accusers" in the original Federal Confrontation Clause, arguably, focusing upon whether a hearsay statement is an accusation is "historically correct." WRIGHT & GRAHAM, *supra* § 6371.3, at 207.

We now turn to the issue at hand: whether the blood sample collection form and blood tests upon which Dr. Wagner based his testimony were testimonial. Whether a statement is testimonial under *Crawford* and *Davis* is a legal conclusion, which we review *de novo*. *Ayer*, 154 N.H. at 508. We address the blood sample collection form first.

### 3. Blood Sample Collection Form

■ The blood sample collection form did not accuse the defendant of any wrongdoing. It merely gave information about the technician who withdrew the blood and about the draw itself (*e.g.*, time drawn, cleanser used). *See* RSA 265:90, IV; N.H. ADMIN. RULES, Saf-C 6402.02. Nor did the form describe any of the defendant's past conduct. Rather, it constituted the technician's contemporaneous recordation of observable events. *Geier*, 161 P.3d at 139. The technician filled out the blood sample collection form at the same time or shortly after she drew the defendant's blood. Further, the information supplied on the form was not requested by

law enforcement, but was required by pertinent administrative rules. *See* N.H. ADMIN. RULES, Saf-C 6402.02. Moreover, the technician's statements on the blood sample collection form were not a "weaker substitute for live testimony at trial." *Davis*, 126 S. Ct. 2277 (quotation omitted). If the technician had been called to testify at trial, she "would merely have authenticated the document." *Geier*, 161 P.3d at 135; *see State v. Coombs*, 149 N.H. 319, 323 (2003). Although she signed the blood sample collection form, she likely "would be unable to recall from actual memory information related to [its] specific contents and would rely instead upon the record of ... her own action." *Geier*, 161 P.3d at 136 (quotation omitted); *see Coombs*, 149 N.H. at 323.

The blood sample collection form is, thus, unlike the categories of statements that the Court "defined as unquestionably testimonial." *Forte*, 629 S.E.2d at 143. It "bears little resemblance to the civil-law abuses the Confrontation Clause targeted." *Crawford*, 541 U.S. at 51. We hold, therefore, that it is not testimonial within the meaning of *Crawford* and *Davis*.

### 4. Blood Test Results

██ We next address the blood tests upon which Dr. Wagner based his testimony. Unlike most of the cases involving laboratory reports, the blood tests at issue here were *never* offered or admitted into evidence. The only evidence of the defendant's blood alcohol content came from Dr. Wagner's testimony regarding the "final report[ed] result," which he prepared. None of the raw data from which he derived this result were admitted into evidence. We conclude that, in this case, permitting Dr. Wagner to give his opinion of the test results, absent the testimony of the analyst who conducted the test, did not violate the defendant's Confrontation Clause rights because the tests were not testimonial.

The results generated from the blood test were neutral, as the tests could have led either to incriminatory or exculpatory results. *Geier*, 161 P.3d at 140. Moreover, to the extent that the actual reported test result is deemed to be accusatory, this result was reached and conveyed not through the nontestifying analyst's report, but by Dr. Wagner, the testifying witness. *See id.*; *cf. Coombs*, 149 N.H. 319 (decided before *Crawford* and *Davis*) (State Confrontation Clause not violated when certifying scientist testifies to blood test results, even though he did not conduct blood tests; cross-examination of certifying scientist is effective substitute for right to confront actual analyst). Under New Hampshire regulations, the reported value of the blood sample is determined by averaging the value of two replicate tests and rounding to the second decimal place. *See* N.H. ADMIN. RULES, Saf-C 6402.11, 6402.12. Dr.

Wagner testified that he personally prepared this analysis. Further, had the analyst appeared at the hearing, she "would almost certainly not remember her performance of [the] specific test [of the defendant's blood] months later." *Coombs*, 149 N.H. at 323. Her testimony would have been nearly identical to that of Dr. Wagner as it "would concern her general knowledge of the State Laboratory's test procedures and protocols, quality control measures, specific levels of review and chain of custody matters." *Id.* Given these circumstances, we conclude that the blood tests were not testimonial.

### 5. Conclusion

Having ruled that the blood sample collection form and blood tests upon which Dr. Wagner based his testimony are not testimonial, we hold that admission of the form and Dr. Wagner's testimony did not violate the Federal Confrontation Clause.

Although in *Ayer*, 154 N.H. at 508, we set forth a two-step analysis under which we apply *Roberts* to out-of-court statements that are not testimonial, we do not do so in this case for two reasons. First, since we decided *Ayer*, the United States Supreme Court has clarified that the Federal Confrontation Clause applies *only* to out-of-court statements that are testimonial. *Whorton v. Bockting*, 127 S. Ct. 1173, 1183 (2007); *see Davis*, 126 S. Ct. at 2273 (noting, with respect to testimonial statements, "[i]t is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause"). Second, the defendant makes no argument under *Roberts*. *See Ayer*, 154 N.H. at 511.

Accordingly, for all of the above reasons, we hold that the blood sample collection form and the blood tests upon which Dr. Wagner based his testimony are not testimonial hearsay under *Crawford* and *Davis*. The admission of the form and Dr. Wagner's testimony, absent the testimony of the technician who drew the defendant's blood or the analyst who tested it, did not violate the Federal Confrontation Clause.

*Affirmed.*

GALWAY and HICKS, JJ., concurred; DUGGAN, J., with whom BRODERICK, C.J., joined, dissented.

DUGGAN, J., dissenting. The majority's thoughtful opinion is one of the best efforts a court has made to harmonize recent United States Supreme Court cases concerning the Confrontation Clause, the realities of criminal trial practice and state statutory provisions. However, because I believe

that *Crawford v. Washington*, 541 U.S. 36 (2004), requires a different result, I respectfully dissent.

The United States Supreme Court's decision in *Crawford* effectuated a major change in how alleged violations of the Federal Confrontation Clause must be analyzed. *See State v. Ayer*, 154 N.H. 500, 504-05 (2006), *petition for cert. filed* (U.S. Apr. 26, 2007) (No. 06-11028). Before *Crawford*, we applied the standard announced in *Ohio v. Roberts*, 448 U.S. 56 (1980), making a basic foundational inquiry into the reliability of the evidence. Under *Roberts*, evidence was considered to have "adequate 'indicia of reliability'" if it fell "within a firmly rooted hearsay exception," or possessed "particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66; *Ayer*, 154 N.H. at 505.

In *Crawford*, the United States Supreme Court eliminated reliability as the foundation upon which Confrontation Clause analyses rest, explaining:

> Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of "reliability." . . . Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. . . .
>
> . . . .
>
> Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes.

*Crawford*, 541 U.S. at 61-62. Thus, the Court held that the Confrontation Clause bars the admission of "testimonial statements of a declarant absent from trial [unless] . . . the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the declarant." *Ayer*, 154 N.H. at 505; *Crawford*, 541 U.S. at 59; *Davis v. Washington*, 126 S. Ct. 2266, 2275 n.4 (2006). "This ruling effected a sea change in the jurisprudence of the Confrontation Clause—but the Court left open the parameters of [what would constitute] testimonial hearsay, and so its ruling produced a miasma of uncertainty." *United States v. Brito*, 427 F.3d 53, 55 (1st Cir. 2005), *cert. denied*, 126 S. Ct. 2983 (2006).

The principal question presented by this case is whether a blood collection form and blood test result are "testimonial" within the meaning of *Crawford*. In answering this question, the majority carefully summarizes Federal Supreme Court jurisprudence, including *Crawford*, *Davis* and *Roberts*, and discusses how other courts have dealt with this question.

I agree with the majority's well-reasoned discussion of why efforts to apply the business records exception in the Confrontation Clause context must be rejected as inconsistent with *Crawford*. Courts applying the business records exception seize upon dicta from *Crawford*, in which the Court noted that at the time the Framers drafted the Federal Constitution, "[m]ost of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy." *Crawford*, 541 U.S. at 56. However, even under the historical approach taken in *Crawford*, it does not necessarily follow from this dictum that reports like the ones at issue in this case ought to be deemed nontestimonial business records. Business records are not considered "testimonial" because they are prepared for business—not prosecutorial—purposes. Here, by contrast, the records at issue were prepared solely for prosecutorial purposes.

Indeed, at least two courts have exhaustively traced the history of the business records exception from 1791 through modern times. *See Thomas v. United States*, 914 A.2d 1, 13-14 (D.C. 2006), *petition for cert. filed* (U.S. June 28, 2007) (No. 07-5053); *State v. Miller*, 144 P.3d 1052, 105860 (Or. Ct. App.), *adhered to on reconsideration*, 149 P.3d 1251 (Or. Ct. App. 2006). Based upon their thorough reviews of the history of the business records exception, both courts persuasively concluded that the Framers would not have considered reports like those at issue here to be nontestimonial business records. *Thomas*, 914 A.2d at 14; *Miller*, 144 P.3d at 1060. For example, the *Thomas* Court concluded:

> As an historical matter, the exception in 1791 was a very narrow one. *See generally* 5 John Henry Wigmore, *Evidence in Trials at Common Law*, §§ 1518-19 (1974 ed.). In *Crawford*, the Supreme Court found no evidence that the historical business records exception (or any other historical exception apart from that for dying declarations) ever had been "invoked to admit *testimonial* statements against the accused in a *criminal* case," nor any indication that the Framers thought it could be so used. 541 U.S. at 56, 124 S.Ct. 1354 (emphasis in original). Traditionally, the historical business records exception did not encompass records prepared for use in litigation, let alone

records produced *ex parte* by government agents for later use in criminal prosecutions. *See, e.g., United States v. Smith,* 172 U.S. App. D.C. 297, 306, 521 F.2d 957, 966 (1975) (discussing the generally accepted "litigation records" doctrine that would "deny the business records exception to any document prepared with an eye toward litigation when offered by the party responsible for making the record.").

*Thomas,* 914 A.2d at 13.

I find the historical approach and conclusions reached in *Thomas* and *Miller* to be persuasive, especially because the reports at issue were prepared in anticipation of trial and at the request of police officials. The

> [i]nvolvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse—a fact borne out time and again throughout a history with which the Framers were keenly familiar. This consideration does not evaporate when testimony happens to fall within some broad, modern hearsay exception, even if that exception might be justifiable in other circumstances.

*Crawford,* 541 U.S. at 56-57 n.7. Thus, as the Court of Appeals for the District of Columbia reasoned, "where a document is created primarily for the government to use ... as a substitute for live testimony in a criminal prosecution, the fact that the document might happen to fall within the jurisdiction's business records exception to the hearsay rule does not render the document non-testimonial." *Thomas,* 914 A.2d at 14; *see also Johnson v. State,* 929 So. 2d 4, 7 (Fla. Dist. Ct. App. 2005), *review granted,* 924 So. 2d 810 (Fla. 2006).

After summarizing the legal landscape, the majority announces and applies a three-part test that focuses upon whether the statement at issue: (1) documents past events (as opposed to being a contemporaneous recordation of observable events); (2) was prepared in a manner resembling *ex parte* examination; and (3) is an accusation. Affirmative answers to these questions indicate that a statement is testimonial.

As a theoretical matter, the test set forth in the majority's opinion admirably leaves some room for a trial court to evaluate each piece of evidence in context to determine whether it is testimonial. However, the first and last prongs of the test focus upon the content of the statements at issue, *i.e.,* the time frame they describe and whether they are accusatory in nature. *Crawford*'s core class of testimonial statements, on the other hand, focuses not upon the content of the statements, but upon the process through which the statements were made. *Crawford,* 541 U.S. at 51-52.

Further, reduced to their essence, the three prongs of the test appear to constitute a means of making an initial or threshold reliability assessment and thus concluding that cross-examination would be of little value. For example, one reason that the contemporaneous recordation of observable events is a hearsay exception (a present sense impression), is that such a statement is deemed inherently more reliable than a recitation of past events. *See Simpkins v. Snow*, 139 N.H. 735, 738 (1995); N.H. R. Ev. 803 Reporter's Notes. Likewise, accusations are not inherently reliable because they amount to one person's claim that another has perpetrated some act. Evaluating accusations often requires the assessment of demeanor and other credibility determinations that can only be made during live testimony.

Although the Confrontation Clause's "ultimate goal is to ensure reliability of evidence," *Crawford* makes clear that "[w]here testimonial statements are involved, . . . the Framers [did not intend] to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.' . . . Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation." *Crawford*, 541 U.S. at 61. Thus, nothing in *Crawford* suggests that because cross-examination concerning a particular statement may be of little value, the requirements of the Confrontation Clause are satisfied. Accordingly, while I find the majority's test to be balanced, I think *Crawford* severely constrains our analysis and forbids us from adopting it. *Crawford* simply does not seem to allow us to make preliminary reliability assessments to determine whether the right of confrontation applies. *See Crawford*, 541 U.S. at 61 (the Confrontation Clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination").

In terms of applying the three-prong test, there are some open questions. Three examples are illustrative. First, under the test, it appears that in a first degree or capital murder trial, identification or cause of death may be established through the affidavit of, for example, a DNA analyst who does not testify. Indeed that appears to be the result in *People v. Geier*, 161 P.3d 104 (Cal. 2007), which announced a reformulation of *Crawford* similar to the majority's. I simply do not agree that the Confrontation Clause allows the State to use the affidavits of its agents to prove a DNA match in a death penalty case. Second, asking whether a statement is an accusation may produce some odd results because many calls to the police are accusatory, including the 911 call at issue in *Davis*. Finally, emphasizing temporal concerns also leaves open the door for some interesting debate. For instance, with respect to an autopsy report, one

could argue that the pathologist is simply recording what he or she is *presently* seeing as the test's result for a given subject; however, one could just as easily argue that the pathologist is actually recording the subject's physical state or cause of death from a given day *in the past*.

Thus, like the Missouri and Minnesota Supreme Courts, *see State v. March*, 216 S.W.3d 663, 666 (Mo. 2007); *State v. Caulfield*, 722 N.W.2d 304, 310 (Minn. 2006), I believe that the United States Supreme Court's decision to "leave for another day any effort to spell out a comprehensive definition of 'testimonial,'" *Crawford*, 541 U.S. at 68, requires us to adhere to the three "formulations of [a] core class of testimonial statements" announced in *Crawford*:

> *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id.* at 51-52 (quotations and citations omitted). We must also be mindful that, in *Davis*, the Court held that statements are also testimonial when made in response to police interrogation, when "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Ayer*, 154 N.H. at 507 (quotation omitted).

If we apply these principles to the blood test result, it satisfies two of the three "core" criteria articulated in *Crawford*. *Crawford*, 541 U.S. at 51-52. It is an *ex parte* affidavit about which Dr. Wagner testified. *State v. Coombs*, 149 N.H. 319, 322 (2003) ("A laboratory test used to prove an essential element of a criminal offense constitutes ... an *ex parte* affidavit."); *March*, 216 S.W.3d at 666 ("A laboratory report ... that was prepared solely for prosecution to prove an element of the crime charged is 'testimonial' because it bears all the characteristics of an *ex parte* affidavit."). In that capacity, it functioned as the equivalent of testimony for purposes of establishing the defendant's blood alcohol content.

> While lab reports are not testimony as it is generally imagined ..., they are nonetheless statements of a fact relevant to the case as the speaker perceives it. Were the preparer of a lab report to state his or her findings in court, then the spoken contents of the

report would qualify as testimony. Therefore, it makes little sense to say that the same statement cannot be testimony merely because it is offered in the form of a report. In any event, *Crawford* made no indication that whether a statement is testimonial depends upon its format; instead, it merely defined testimony as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact," a criterion most lab reports would have no trouble meeting.

Note, *Testimonial or Nontestimonial? The Admissibility of Forensic Evidence after Crawford v. Washington*, 94 KY. L.J. 187, 203 (2005). Equally important, the analyst performed the test at the request of the police, and she should reasonably have believed that the results she reported would be used by the prosecution to secure a conviction at a subsequent trial for DWI. Thus, since use of *ex parte* affidavits to secure criminal convictions was "the principal evil at which the Confrontation Clause was directed," *Crawford* compels a conclusion that the blood test result was "testimonial." *Crawford*, 541 U.S. at 50.

A significant, and growing, number of courts from around the country have reached the same conclusion. *See State v. Birchfield*, 157 P.3d 216, 220 (Or. 2007) (deciding issue under Oregon Constitution); *March*, 216 S.W.3d at 667 (deciding under *Crawford* that laboratory report identifying substance as cocaine was testimonial); *Miller*, 144 P.3d at 1060 (deciding under *Crawford* that laboratory test result concluding urine and pipe residue contained methamphetamine was testimonial); *Thomas*, 914 A.2d at 12 (deciding under *Crawford* that laboratory test identifying substance as cocaine was testimonial); *Caulfield*, 722 N.W.2d at 310 (deciding under *Crawford* that laboratory test result identifying substance as cocaine was testimonial); *State v. Campbell*, 719 N.W.2d 374, 377 (N.D. 2006) (assuming report from crime lab identifying substance as marijuana was testimonial), *cert. denied*, 127 S. Ct. 1150 (2007); *United States v. Rahamin*, 168 Fed. Appx. 512, 520 (3d Cir. 2006) (recognizing that a DEA laboratory report appeared to be a testimonial statement since it was offered to prove the weight and substance of ecstasy pills); *City of Las Vegas v. Walsh*, 124 P.3d 203, 207-08 (Nev. 2005) (deciding under *Crawford* that nurse's affidavit describing procedure used to draw blood was testimonial), *cert. denied*, 547 U.S. 1071 (2006); *Belvin v. State*, 922 So. 2d 1046, 1054 (Fla. Dist. Ct. App. 2005) (deciding under *Crawford* that portions of breath test affidavit were testimonial), *review granted*, 928 So. 2d 336 (Fla. 2006); *Johnson*, 929 So. 2d at 8 (deciding under *Crawford* that laboratory report identifying substances as cocaine and marijuana was testimonial); *State v. Crager*, 844 N.E.2d 390, 396 (Ohio Ct. App. 2005) (deciding under

*Crawford* that DNA analyst's report was testimonial), *appeal allowed*, 846 N.E.2d 533 (Ohio 2006); *People v. Rogers*, 780 N.Y.S.2d 393, 396-97 (App. Div. 2004) (deciding under *Crawford* that admission of blood test results violated Confrontation Clause); *People v. Lonsby*, 707 N.W.2d 610, 620-21 (Mich. Ct. App. 2005) (deciding under *Crawford* that information from lab report intimating that substance on defendant's shorts was semen was testimonial and inadmissible), *appeal denied*, 720 N.W.2d 742 (Mich. 2006); *State v. Berezansky*, 899 A.2d 306, 312 (N.J. Super. Ct. App. Div. 2006) (deciding under *Crawford* that laboratory certificate indicating sample of defendant's blood contained a blood-alcohol level of .33 percent was a testimonial statement because the report was not a record prepared or maintained in the ordinary course of government business, but was prepared in order to prove an element of the crime and offered in lieu of producing the qualified individual who actually performed the test), *cert. granted*, 923 A.2d 231 (N.J. 2007).

Some of the foregoing cases involved reports based upon tests other than blood alcohol analysis—for example, DNA testing, autopsies and breath tests. The courts in many of these cases cited each other as persuasive authority to support their reasoning. By so doing, these courts have correctly recognized that there is no principled way to distinguish among these tests or reports for purposes of *Crawford*.

The same is true of the blood collection form. In *State v. Renshaw*, 915 A.2d 1081, 1087 (N.J. Super. Ct. App. Div. 2007), the court determined that a hospital nurse's blood sample certification, completed pursuant to a New Jersey statute, was testimonial under *Crawford*. There, as here, a private hospital employee was asked by a police officer to draw a blood sample from a suspected drunk driver. *Id.* at 1083. The employee did so, using a kit provided by the officer. *Id.* The employee then gave two vials of extracted blood to the officer, along with a blood collection form akin to the one at issue here. *Id.* at 1084. The court concluded that the collection form was "prepared for purposes of trial, and indeed only for purposes of trial, [and could be considered] nothing other than testimonial." *Id.* at 1087; *see also State v. Kent*, 918 A.2d 626, 637-38 (N.J. Super. Ct. App. Div. 2007) (reaffirming *Renshaw* and holding that the primary purpose of the certificate "was surely to preserve evidence for a future anticipated DWI prosecution").

Thus, like the blood test result, the blood collection form was testimonial within the meaning of *Crawford*. It constituted an extrajudicial affidavit being offered to prove or establish the procedures followed during blood collection. Moreover, the blood collection form at issue here was prepared at the request of the police, and its sole intended use was to secure a conviction at trial.

148

Before concluding, I note that this case is decided under the Federal Constitution. State constitutional issues remain open as do issues involving whether we may, in the exercise of our supervisory power, require live testimony at trial under certain circumstances.

Finally, I recognize that if my view were adopted, it would be of no slight consequence for the prosecution of certain offenses in this state and for expert witnesses. However, until the United States Supreme Court modifies or clarifies *Crawford*, or charts a different course, I, like the courts whose opinions are cited above, believe we are compelled to follow *Crawford* and to apply its reasoning to the hearsay statements currently before us. Thus, I would reverse the defendant's conviction and remand for further proceedings.

BRODERICK, C.J., joins in the dissent.