J-A25018-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| T.J.K. | : | IN THE SUPERIOR COURT OF |
| Appellee | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| M.D.C. | : | |
| | : | |
| Appellant | : | No. 3321 EDA 2017 |

Appeal from the Judgment of Sentence September 5, 2017
In the Court of Common Pleas of Delaware County Civil Division at
No(s): CV-2015-080484

BEFORE: PANELLA, J., DUBOW, J., and KUNSELMAN, J.

MEMORANDUM BY PANELLA, J.:           **FILED MAY 23, 2019**

M.D.C. ("Mother") appeals from the judgment of sentence entered after the trial court found her guilty of indirect criminal contempt of a Protection from Abuse ("PFA") order in this highly contentious custody and visitation dispute. Mother asserts the order did not clearly give her notice that she was prohibited from entering the church where T.J.K. ("Father") and their children ("the Children") were participating in an evening mass. She also argues the evidence was insufficient to establish she acted with wrongful intent. We affirm.

This is the second of three inter-related companion appeals with a long, complex, and somewhat convoluted history. We derive the facts and procedural history of this case primarily from the trial court's opinion. Mother, Father, and Mother's parents ("Grandparents") have been involved in some

form of custody or visitation disputes over Mother and Father's two minor children ("Children") since at least 2011.

Father is a citizen of the United States. Mother is a native of Argentina.[1] Grandparents are also from Argentina. The marriage of Appellee T.J.K. and Mother resulted in two Children, M.A.K. (born in 2009) and T.M.K. (born in 2010). At various times, Mother and Father lived in Argentina, in or near Buenos Aires, and Delaware County, Pennsylvania. For a time, Grandparents lived with Father, Mother, and the Children.

Father has been granted primary physical custody of the Children in Pennsylvania on an emergency basis. Pertinent to the background of this appeal, Father filed for a Protection from Abuse order ("PFA"), alleging, *inter alia*, that Mother and the Grandparents were violent toward the Children.

Father testified that he confronted Mother about such violence toward their daughter in Colorado. In response, Father asserted, Mother attacked him, banging his head against a wall, kicking him repeatedly in the testicles, biting his hand, trying to scratch his eyes, and choking him, in the presence of the Children. A Colorado jury eventually convicted Mother of assault and harassment.

---

[1] While Father only mentions Mother's Argentinian citizenship, he does not dispute Mother's claim to dual United States and Argentinian citizenship.

Notably, Mother was also charged, but eventually acquitted, of child abuse under Colorado law for attacking Father in the presence of the Children. While the criminal charges in Colorado were pending, the Colorado court prohibited Mother from having contact the Children due to the pending child abuse charge. The Colorado order explicitly provided for the court with jurisdiction over custody claims, the Court of Common Pleas of Delaware County, to modify the no-contact order.

Father has further accused Mother and Grandparents of plotting by various means, such as trying to obtain duplicate Argentinian passports, to remove the Children from the United States and return them to Argentina to live with Mother. After Father sought a PFA order, the parties negotiated, through counsel, a stipulation that the trial court incorporated in an order.

Pertinent to the issues on appeal, Mother's visitation with Children was restricted to one hour, twice a week, held in the "gathering room" of the Children's local church in Media, PA.[2] The order required the presence of a security guard, and a Spanish/English translator during Mother's visitation.

---

[2] The address of the church was one of several specified locations that Mother agreed to stay away from as a condition of the PFA order. Mother highlights the discrepancy that she was, and was not, allowed on the church premises. However, the two provisions of the stipulated order are easily reconciled. **See Nitardy v. Chabot**, 195 A.3d 941, 952 (Pa. Super. 2018) (observing that it "is well settled that when interpreting a contract, the specific controls over the general"). Mother was specifically allowed in the gathering room for the visitation periods, but was generally banned from entering the church premises otherwise.

Further, Mother was to have no contact with the Children before or after the actual visitation period. She was to leave the church premises immediately after the visitation was over.

The parties are in substantial agreement on most of the specific facts underlying the conviction for contempt. However, they disagree on the inferences to be drawn from those facts and the law to be applied.

Briefly summarized, on the evening of June 5, 2017, the pastor of the Children's church had invited Father to a "healing Mass" in the parish chapel at 7:00 PM, after the Children's visitation hour with Mother was over.[3] Father accepted the invitation, and brought the Children with him to the Mass. The gathering room was adjacent to the chapel.

After the service had begun, Mother appeared outside the chapel. Both the security guard and the translator warned Mother that, under the visitation order and the PFA order, she was not permitted inside the chapel. The guard and translator gave the warnings in both English and Spanish. Mother entered the chapel despite these warnings. The security guard summoned the police.

---

[3] The healing Mass was for an infant with cancer, unrelated to the parties in this appeal. Mother notes that recollections differed slightly as to whether the pastor invited Father to the Mass, or Father inquired and was invited in response. However, the exact details of the invitation are not material to any issues on appeal or arguments presented for our review.

Mother was arrested and the district attorney brought an action for indirect criminal contempt. Mother was convicted and sentenced to time served, thirty-seven days.[4] Concerning the time Mother spent in jail, it bears noting that Mother was originally considered not eligible for bail because of the pending criminal charges in Colorado. Eventually, however, she was equipped with a monitor and placed on house arrest. This timely appeal followed.[5]

Mother presents two questions on appeal for our review:

1. Where a protection from abuse order allowed contact between [F]ather and [M]other on church property during visitation, and did not address [F]ather keeping the [C]hildren at the church beyond the stipulated visit time, did a reasonable construction of the order allow [M]other to enter the chapel where her [C]hildren were at mass?

2. Where [M]other was allowed to be at the church and she entered a chapel where [F]ather had taken her [C]hildren to mass, was her entry sufficient to support her conviction of criminal contempt?

_____

[4] The trial court also imposed a fine of $300.00 and extended the PFA order to December 31, 2018. Without further extension, that deadline would have expired by now. Nevertheless, we find that Mother's challenges to her conviction for criminal contempt fall within a recognized exception to the mootness doctrine, because there is a reasonable possibility Mother's conviction will result in criminal or civil collateral consequences. **See Commonwealth v. Rohde**, 402 A.2d 1025, 1026 (Pa. 1979).

[5] Mother filed an eight point concise statement of errors on or about October 25, 2017. Several of Mother's asserted errors were repetitive or over-lapped. The trial court condensed Mother's statement of errors into four issues, addressed them, and filed an opinion, on December 5, 2017. **See** Pa.R.A.P. 1925.

Mother's Brief, at 2. In her reply brief, Mother seeks to add a third argument: that "deeming [Father] the prosecutor has structurally denied due process." Mother's Reply Brief, at i. Mother cannot raise a new issue in her reply brief. *See Commonwealth v. Fahy*, 737 A.2d 214, 218 n.8 (Pa. 1999). Therefore, we will not address mother's argument that she was structurally denied due process.

Our standard of review is well-settled.

We review a contempt conviction for an abuse of discretion. We rely on the discretion of the trial court judge and are confined to a determination of whether the facts support the trial court's decision. In reviewing whether the evidence was sufficient to support the conviction, "we must determine whether the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to enable the fact finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt." In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

This Court has repeatedly stated that the purpose of the PFA Act is to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance prevention of physical and sexual abuse. Where a PFA order is involved, an indirect criminal contempt charge is designed to seek punishment for violation of the protective order. A charge of indirect criminal contempt consists of a claim that a violation of an order occurred outside the presence of the court.

In order to establish indirect criminal contempt, the Commonwealth must prove: 1) the order was sufficiently definite, clear, and specific to the contemnor as to leave no doubt of the conduct prohibited; 2) the contemnor had notice of the order; 3) the act constituting the violation must have been volitional; and 4) the contemnor must have acted with wrongful intent.

- 6 –

*Commonwealth v. Felder*, 176 A.3d 331, 333–34 (Pa. Super. 2017) (brackets, quotation marks, and citations omitted).

In her first issue on appeal, Mother argues the PFA order did not provide sufficient notice of what would constitute a violation of the order. Mother contends that it was not clear that she was prohibited from entering the church after her visitation hour had ended. She cites to Father's admission that his attendance at the 7:00 p.m. mass was unusual as evidence that she could no know that her entry at that time would constitute a violation of the PFA order.

After reviewing the record and the briefs of the parties, we conclude the written opinion authored by the Honorable Dominic F. Pileggi thoroughly and adequately addresses Mother's argument. ***See*** Trial Court Opinion, 12/15/17, at 8-12 (finding that Mother was sufficiently conversant in English to understand the terms of the PFA; that her conduct for one and a half years after the entry of the PFA order demonstrated she understood the order's requirements; and that the security guard and translator effectively communicated to Mother that entering the church at that time would constitute a violation of the PFA). We therefore adopt the opinion as our own and affirm on that basis.

In her second issue, Mother argues the evidence was insufficient to sustain her conviction for indirect criminal contempt because Father had no reason to fear for his safety in the presence of the armed security guard. ***See id***. She contends she reasonably expected the PFA order was relaxed under

circumstances where Father was protected by the security guard, citing *Commonwealth v. Haigh*, 874 A.2d 1174 (Pa. Super. 2005).

In *Haigh*, this Court reversed a conviction for indirect criminal contempt of a PFA order. Under the PFA order in that case, the defendant was prohibited from having contact with his wife "at any location." *See id*., at 1177. The trial court found that the defendant, bound and shackled, had violated the PFA when he addressed his wife during the PFA violation hearing. *See id*.

This Court reversed, concluding that the defendant "did not act with wrongful intent by engaging in this conversation with his wife in the courtroom." *Id*. (footnote omitted). "Intentionally acting in such a manner, in the presence of [the trial court], the deputy sheriff, the prosecutor and every other person gathered in the court room, would have been nothing short of irrational[.]" *Id*. "A reasonable person could have believed, and Appellant did believe, that the PFA order was relaxed to some extent in the courtroom context, especially where Appellant was shackled and the victim was protected by an armed deputy sheriff." *Id*.

Like in *Haigh*, Mother was prohibited from "any contact with" Husband or the Children "at any location." In addition, Mother correctly notes the presence of the armed security guard is analogous to the presence of an armed deputy sheriff in *Haigh*.

However, we find *Haigh* easily distinguishable. This was not a situation where contact with the victim was compelled by the dictates of due process,

as it was in **Haigh**. Nor was Mother shackled when she forced her way back into the church despite the protests of the security guard and the translator. It was perfectly reasonable for the trial court to find that Mother acted with wrongful intent when she re-entered the church. **See** Trial Court Opinion, 12/15/17, at 13 (finding that Mother knew she was violating the PFA order when she re-entered church despite the warnings of the guard and the translator).

As neither of Mother's issues on appeal merit relief, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/23/19

# IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
## CIVIL ACTION - LAW

██████████████

**Plaintiff/Appellee**

vs.

███████████████████

**Defendant/Appellant**

**DOCKET NO. 2015-080484**
**MD NO: 27-17**

**Superior Court No.: 3321 EDA 2017**

**IN PROTECTION FROM ABUSE**

Diane Horn, Esquire, Attorney for Plaintiff/Appellee
    Office of the District Attorney, 201 West Front Street, Media, PA 19063
Joseph Rizzo, Esquire, Attorney for Defendant/Appellant
    The Padova Firm, P.C., 640 Shadeland Avenue, Drexel Hill, PA 19026

## OPINION

PILEGGI, J.                                          DATE: December 5, 2017

This Appeal is considered a direct appeal from this Court's September 5, 2017 Final Order of Court. Appellant is Defendant, ███████████████████ ("Wife"). Appellee is Plaintiff, ████████████ ("Husband"). Wife seeks review of this Court's September 5, 2017 <u>Final Order of Court</u>, which found Wife guilty of Indirect Criminal Contempt, in connection with Wife's violation of the <u>Stipulation Under Protection from Abuse Act And Uniform Prevention of Child Abduction Act</u>, ("the Stipulated PFA Order") which was entered as an Order of Court by the Honorable Linda A. Cartisano on November 6, 2015, pursuant to an agreement of the parties executed on October 23, 2015. On appeal, Appellant raises the following issues:

1. Did this Court err in concluding that the <u>Stipulation Under Protection from Abuse Act And Uniform Prevention of Child Abduction Act</u> was definite, clear and specific, the terms of which were understood by Wife, and that Wife's actions which constituted the violation of the Order were volitional,

that Wife acted with wrongful intent, and that Wife's failure to comply with the order was willful or at least reckless?

2. Did this Court err in concluding that the Stipulation Under Protection from Abuse Act And Uniform Prevention of Child Abduction Act was a valid protection from abuse order pursuant to *23 Pa. C.S. § 6102 et seq.* even though it was not in the exact form prescribed by *Pa. R.C.P. No. 1905(e)*?

3. Did this Court err in finding the testimony of Husband and Husband's witnesses credible?

4. Did this Court err in finding Wife guilty of indirect criminal contempt instead of indirect civil contempt when the violation was de minimis ?

## PROCEDURAL HISTORY

On April 14, 2015, Plaintiff/Appellee ██████ ███ ("Husband") filed a Petition for Protection from Abuse against Defendant/Appellant ██████ ███████████████ ("Wife") in the Court of Common Pleas of Delaware County. Husband's Petition requested an order for protection on behalf of himself and the parties' two (2) children, ██████████████ and ████████████ ("the children"). On April 14, 2015, the Honorable Barry C. Dozor issued a Temporary Protection from Abuse Order which granted an order for protection on behalf of Husband and the children, and listed the matter for a hearing for further adjudication with respect to Husband's request for a Final Protection from Abuse Order.

On October 23, 2015, in resolution of Husband's Petition for Protection from Abuse, the parties entered into a Stipulation Under Protection from Abuse Act And

Uniform Prevention of Child Abduction Act ("Stipulated PFA Order") which was entered as an Order of Court by the Honorable Linda A. Cartisano on November 6, 2015.

On June 7, 2017, the Commonwealth of Pennsylvania filed a Complaint for Indirect Criminal Contempt against Wife due to an alleged violation of the Stipulated PFA Order. On June 15, 2017 and September 5, 2017, this Court held hearings to adjudicate the merits of the Commonwealth's Complaint for Indirect Criminal Contempt. On September 5, 2017, this Court entered an Order finding Wife guilty of Indirect Criminal Contempt and imposing a sentence of time served, a Three Hundred Dollar ($300.00) fine, and extension of the Stipulated PFA Order until December 31, 2018. On September 15, 2017, Wife filed a Motion to Reconsider the Verdict.[1] On September 27, 2017, this Court entered an Order which denied Wife's Motion to Reconsider the Verdict. On October 4, 2017, Wife filed a Notice of Appeal to Superior Court. On October 11, 2017, this Court issued an Order requesting a Statement of Errors Complained of on Appeal pursuant to Pa. R.A.P 1925(b). On October 25, 2017, Wife filed a Statement of Errors Complained of On Appeal.

---

[1] Wife's Motion to Reconsider the Verdict was not a Motion for a New Trial and did not request a new trial. Wife's Motion to Reconsider the Verdict did not contain any allegation that this Court erroneously found Husband's witnesses to be credible and did not make a weight of the evidence claim. This is relevant to Wife's claim in the instant appeal that this Court erred in finding Husband's witnesses credible. See Pa.R.Crim.P. 607; See also Commonwealth v. Walsh, 36 A.3d 613, 622 (Pa. Super. 2012).

## FACTS

**Protection from Abuse Proceeding:** On April 14, 2015, Husband filed a Petition for Protection from Abuse against Wife, on behalf of himself and the parties' children. *See Exhibit C-1* at Page 2 ¶ 4. In resolution of Husband's Petition for Protection from Abuse, on October 23, 2015, Husband and Wife executed a Stipulation Under Protection From Abuse Act And Uniform Prevention of Child Abduction Act, which was entered as an Order, by the Honorable Linda A. Cartisano on November 6, 2015 ("the Stipulated PFA Order"). Paragraph 7 of the Stipulated PFA Order contained the following provisions:

7. For three (3) years from the date of this Court's Order issued pursuant to this Stipulation:

   a. [Wife] will stay away from [Husband] and the parties' children...except for any visitation or custody with Children as ordered by the Court in existence entered prior to this date or hereafter.

   b. [Wife] shall not abuse, harass, stalk, or threaten [Husband] or any of the Children.

   c. [Wife] shall not contact [Husband] (except for emergency concerning the children and only by text or email) or any of the Children by any means directly or indirectly except as permitted by Court Order entered prior to this date or hereafter.

   d. [Wife] is prohibited from any contact with [Husband], the Children, or any other person protected under this agreement, either directly or indirectly, at any location, including but not limited to any contact at [Husband's] or other protected parties' residence, school, business, or place of employment. [Wife] is

specifically ordered to stay from the following locations for the duration of this order:

1. 56 Sleepy Hollow Drive, Newtown Square, Pennsylvania, until [Husband] vacates the residence.

2. 2400 North Providence Road, Media, Pennsylvania.

3. 211 Commerce Court, Suite 104, Pottstown, Pennsylvania

*Stipulation Under Protection From Abuse Act and Uniform Prevention of Child Abduction Act,* at ¶ 7; *See also N.T. 6/15/17* at 6.

Wife testified that she executed the Stipulated PFA Order to resolve the ongoing PFA litigation and that she "thought the best way...of resolving that issue was to sign that stipulation with no admission of guilt and to work things out on (sic) the custody court." *N.T. 9/5/17* at 36.

**Child Custody Proceeding:** There is a child custody proceeding, docketed in the Delaware County Court of Common Pleas under case number 2015-003199. This child custody proceeding was initiated prior to the within Protection from Abuse matter, by the filing of an Emergency Petition for Custody and Emergency Petition for Return of Passports, filed on April 9, 2015. On April 24, 2015, an Order on Emergency Petition for Custody[2] ("the Custody Order) was entered by the Honorable Linda A. Cartisano. Paragraphs one (1) through four (4) of the Custody Order provided for an award of legal and physical custody rights as follows:

---

[2] Although subsequent orders of court have been entered in the custody matter, the April 24, 2015 Order on Emergency Petition for Custody provides for the physical custody schedule that was in effect on June 5, 2017, the date of the incident giving rise to the allegation of indirect criminal contempt, and as of June 15 and September 5, 2017, the dates of trial on this indirect criminal contempt matter.

1.  Primary physical custody of the minor children ████████████
    ████ born May 9, 2009, and █████████ ████ born
    September 3, 2010, is hereby awarded to [Husband] until further
    Order of Court.

2.  Joint legal custody with respect to medical care and decisions is
    awarded to [Husband] and [Wife].

3.  Sole legal custody for all else awarded to [Husband] until further
    Order of this Court.

4.  Supervised partial physical custody of the minor children,
    ████████████ and ████████████ is awarded
    to [Wife], as follows: two sessions a week for one hour each,
    supervised by security personnel who may carry concealed arms
    and observed by an independent Spanish/English speaker
    interpreter; the said sessions to be in a classroom at St. Mary
    Magdalene Church in Media, Pennsylvania Mondays at 5:30 p.m.
    to 6:30 p.m.[3] and Thursdays at 4:15 p.m. to 5:15 p.m.; costs to be
    borne by [Husband]; no other persons are to be present at the
    sessions; and [Wife's] parents, Olga Cifuentes, and Julio Cesar
    Domingues are not to be on the grounds of the church during these
    sessions.

*See 4/24/15 Order on Emergency Petition for Custody,* at ¶ 1-4.

**Plaintiff's Complaint for Indirect Criminal Contempt**: Husband testified that on

June 5, 2017, at approximately 7:00 p.m. he appeared at St. Mary Magdalene

Church to retrieve the children from their scheduled supervised visit with Wife.

Pursuant to an invitation from the church's pastor to attend a "healing mass"

Husband and the children entered the chapel and sat in a pew approximately four

(4) rows from the front. *N.T. 6/15/17,* at 17-20. Husband testified that, during the

---

[3] This visitation time was changed by agreement of the parties to commence at 6:00 p.m. and conclude at 7:00 p.m. *See N.T. 6/15/17,* at 11.

service, Wife appeared and entered into the chapel. According to Husband's testimony, upon seeing Wife, the children were frightened and physically grabbed Husband. Husband further testified that Wife looked at him, smiled, and made "a hand gesture." *Id.* at 21-23. Husband testified that the sight of Wife outside the presence of security was a frightening experience for the children "because of...multiple incidents, kidnappings, abuse that have occurred..." *Id.* at 25-26.

Husband's testimony with respect to Wife's entry into the chapel was corroborated by security officer Michael Balsama and Dr. Jay Jemail ("Dr. Jay"). Michael Balsama testified credibly that he approached Wife, before she entered the chapel, and with the assistance of Dr. Jay, a Spanish/English translator, informed Wife that she should not enter the chapel because Husband and the children were inside. Mr. Balsama further instructed Wife that her entry into the chapel would constitute a violation of the Stipulated PFA Order. *Id.* at 82-90. According to the testimony of Dr. Jay, who was with Mr. Balsama and translated Mr. Balsama's instructions to Wife in Spanish, Wife heard the instruction given by Mr. Balsama in English, and translated by Dr. Jay in Spanish, immediately "did a 180 degree turn," and walked into the chapel where she had been told Husband and the children were present. *Id.* at 120-26

Wife testified that she walked into the chapel not knowing that Husband and the children were inside. Wife further testified that she entered the chapel to escape harassment from Husband's "security team." *N.T. 9/5/17,* at 46-50.

## DISCUSSION

Wife raises the following issues on appeal:

1. **Did this Court err in concluding that the <u>Stipulation Under Protection from Abuse Act And Uniform Prevention of Child Abduction Act</u> was definite, clear and specific, the terms of which were understood by Wife, and that Wife's actions which constituted the violation of the Order were volitional, that Wife acted with wrongful intent, and that Wife's failure to comply with the order was willful or at least reckless?**

Where a PFA order is involved, an indirect criminal contempt charge is designed to seek punishment for violation of the protective order.... To establish indirect criminal contempt, the Commonwealth must prove: (1) the Order was sufficiently definite, clear, and specific to the contemnor as to leave no doubt of the conduct prohibited; (2) the contemnor had notice of the Order; (3) the act constituting the violation must have been volitional; and (4) the contemnor must have acted with wrongful intent. *Commonwealth v. Brumbaugh,* 932 A.2d 108, 110 (Pa. Super. 2007); *Commonwealth v. Ashton,* 824 A.2d 1198, 1202 (Pa. Super. 2003).

With respect to Element (1), Wife believes that this Court erred in concluding that the Stipulated PFA Order was sufficiently definite, clear, and specific to the contemnor as to leave no doubt of the conduct prohibited, because the Stipulated

PFA Order "did not define 'contact' and did not state 'immediate' and 'immediate' was not defined." *See Statement of Errors Complained of on Appeal*, at ¶ 3-4. The Stipulated PFA Order states that "[Wife] is prohibited from any contact with [Husband], the Children...either directly or indirectly, at any location..." *Stipulated PFA Order*, at ¶ 7d. The Stipulated PFA Order prohibits "contact...either indirectly or directly." The language referencing "contact" contained in the Stipulated PFA Order is identical to the language referencing "contact" under *Pa. R.C.P. No. 1905(e)*. Nowhere in the forms prescribed under *Pa. R.C.P. No. 1905(e)* is the word "contact" defined or the word "immediate" mentioned (with respect to contact between a Plaintiff and Defendant). Given the fact that the references to "contact" and "immediate" are exactly as prescribed under *Pa. R.C.P. 1905(e)* this Court found that the language contained in the Stipulated PFA Order was sufficiently clear, concise, and specific. *See Stipulated PFA Order; See also Pa. R.C.P. No. 1905(e)*.[4]

With respect to element (2), whether Wife had notice of the specific order or decree, this Court found that Wife and her counsel executed the Stipulated PFA Order on October 23, 2015, and that the Stipulated PFA Order was entered as an

---

[4] This Court can't help but note the contradictions contained in Wife's Statements of Errors Complained of on Appeal. Wife believes this Court abused its discretion by holding that the Stipulated PFA Order was clear, definite and specific, despite the fact that the first page was not in the exact form provided under *Pa. R.C.P. 1905(e)*. Wife also believes that this Court abused its discretion by holding that the Stipulated PFA Order was clear, definite and specific on the basis that its references to "contact" and lack of reference to "immediate" are exactly as prescribed in the forms found under *Pa. R.C.P. No. 1905(e)*.

order of court on November 6, 2015. Not only did Wife execute the Stipulated PFA Order, but she complied with its terms from November 6, 2015 until June 5, 2017, the date of the alleged violation. This Court therefore found that Wife had notice of the Stipulated PFA Order. However, in her Statement of Matters Complained of on Appeal, Wife contends that this Court erred when "it found that [Wife], who is not a Native English speaker, and who testified that she did not speak English well and that no one ever read the [Stipulated PFA Order] in her native language met the Diamond test[5] when no evidence was presented that [Wife] understood the Order." *See Statement of Errors Complained of on Appeal,* at ¶ 4). Any insinuation from Wife that she did not have notice of the terms of the Stipulated PFA Order, because she "is not a native English speaker" was not credible. Wife testified that she signed the agreement because she "thought the best way…of resolving that issue was to sign [the Stipulated PFA Order] with no admission of guilt…" *See N.T. 9/5/17* at 36. Wife, who testified in English during the trial on this matter, also testified that during visitation with the children she will read to them in English. *Id.* at 43. This Court found no indication that Wife could not "understand the terms of the [Stipulated PFA Order] because she was not a native

---

[5] Wife refers to "the Diamond Test" in her Statement of Errors Complained of on Appeal. From the surrounding context, and syntax used by Wife in crafting her Statement of Errors Complained of on Appeal, this Court believes that Wife is referring to the factors prescribed under the case of *Diamond v. Diamond*, 715 A.2d 1190 (Pa. Super. 1998). However, this Court finds it more accurate to analyze a finding of indirect criminal contempt in accordance with factors prescribed under *Commonwealth v. Brumbaugh, 932 A.2d 108, 110 (Pa. Super. 2007),* which specifically relates to contempt of a Protection from Abuse Order.

English speaker." In order for this Court to conclude that Wife did not have notice of the Stipulated PFA Order, because she did not sufficiently understand its terms, this Court would have to, in summary, conclude the following:

a. That Wife was presented with an agreement containing terms restricting contact between her and her children, and between her and her husband;

b. That her counsel did not ensure that she fully understood the terms of the agreement;

c. That she and her counsel signed the agreement without Wife fully understanding its terms;

d. After that agreement was entered by the Court as the Stipulated PFA Order, Wife coincidentally complied with its terms for a period of two (2) years, until the incident giving rise to the instant appeal;

e. For approximately two (2) years Wife complied with the terms of the Stipulated PFA Order without questioning why any form of "contact" between her and her children was prohibited;

Considering the above established facts, this Court found that Wife understood the terms of the Stipulated PFA Order, and that by signing it, she had resolved the underlying PFA dispute between her and Husband. Accordingly, this Court found that Wife had sufficient notice of its existence to warrant a verdict of indirect criminal contempt in this matter.

With respect to element (3), whether Wife's actions were volitional, "an act is volitional if it is knowingly made." *Brumbaugh*, 932 A.2d at 110. In *Brumbaugh*, the Defendant answered an invitation from the victim to attend a birthday party together. The Superior Court, in affirming the trial court's verdict of indirect criminal contempt, held that "Defendant knowing he was under a PFA Order to have no contact with the victim that evening nevertheless went to the party with her. He was not drugged, forced, or threatened." *Id.* at 111. This Court found that credible testimony established that Wife was outside of the chapel when she was approached by Michael Balsama and Dr. Jay, who informed her in English and Spanish that Husband and the children were inside the chapel and instructed her not to enter the chapel, and further informed her that entering the chapel would constitute a violation of the Stipulated PFA Order. After hearing these instructions, Wife, who was facing away from the chapel, "did a 180 degree turn" and entered the chapel. From the credible testimony presented at trial, this Court concluded that Wife's actions were done with the specific knowledge that Husband and the children were inside the chapel, and that entering the chapel would constitute a violation of the Stipulated PFA Order. The Court was not persuaded by Wife's testimony that she entered the chapel in order to escape the "harassment" of "Husband's security team" and did not find Wife credible that she could only escape this "harassment" by entering the chapel.

With respect to Element (4), whether Wife acted with wrongful intent, "wrongful intent can be imputed by virtue of the substantial certainty that, by choosing to contact the victim, the defendant would violate the "no contact" provision of the PFA." *Brumbaugh*, 932 A.2d at 111. The Stipulated PFA Order specifically states that "[Wife] is prohibited from any contact with [Husband], the Children...either directly or indirectly, **at any location,** including but not limited to any contact at [Husband's]...residence, school, business, or place of employment..." *Stipulated PFA Order*, at ¶ 7 (Emphasis Added). Wife knew that by entering the chapel, she would violate the Stipulated PFA Order. Wife was instructed in both English and Spanish that Husband and the children were inside the chapel and that entry into the chapel would be a violation of the Stipulated PFA Order. Based on credible testimony of several witnesses, this Court found that Wife acted with wrongful intent when she violated the Stipulated PFA Order.

Therefore, based upon the evidence and credible testimony presented at trial, this Court found that the Stipulated PFA Order (1) was sufficiently definite, clear, and specific to Wife as to leave no doubt of the conduct prohibited; (2) the Wife had notice of the Order; (3) the act constituting the violation was volitional; and (4) Wife acted with wrongful intent.

**2.     Did this Court err in concluding that the <u>Stipulation Under Protection from Abuse Act And Uniform Prevention of Child Abduction Act</u> was a valid protection from abuse order pursuant to *23 Pa. C.S. § 6102, et seq.* even though it was not in the exact form prescribed by *Pa. R.C.P. No. 1905(e)*?**

Wife alleges, in her Concise Statement of Errors Complained of on Appeal, that this Court "abused its discretion when it determined that the Protection from Abuse was clear and concise even though the order was not clear and concise by statute because it was not in the proper form." Wife raised this argument during the hearing on this matter when she requested "that the Protection from Abuse be declared per se not clear or not definitive because it does not follow or conform to the rule for the PFA..." *See Statement of Errors Complained of on Appeal*, at ¶ 1

In accordance with *Pa. R.C.P. No. 1905(e)*,

(e) The Final Order of Court, or any amended, modified or extended Final Order of Court, entered pursuant to the Act shall be substantially in the following form, but the first page must be exactly as set forth in this rule:

Wife's position is that *Pa. R.C.P. No. 1905(e)* was not followed because the first page of the Stipulated PFA Order was not in the form prescribed under *Pa. R.C.P. No. 1905(e)*. This Court notes that the Stipulated PFA Order does not contain a first page in the exact form prescribed by *Pa. R.C.P. No. 1905(e)* and that *Pa. R.C.P. No. 1905(e)* is clear when it states specifically that "the first page must be exactly as set forth in this rule."

This Court also notes that pursuant to *Pa. R.C.P. 127 (a)* "the object of all interpretation and construction of rules is to ascertain and effectuate the intention of the Supreme Court." In applying this guideline, a rule should not be construed in a way that would make it contradict an express statute on the same subject, if it can be avoided. *Shapiro v. Magaziner*, 210 A.2d 890 (Pa. 1965). When construing a rule of civil procedure, the Superior Court's objective is to ascertain and effectuate the intent of the Supreme Court of Pennsylvania. *Willits v. Fryer*, 734 A.2d 425 (Pa. Super. 1999).

*Pa. R.C.P. No. 127(b)* provides that "every rule shall be construed, if possible, to give effect to all its provisions. When the words of a rule are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." Where there is a conflict between the spirit of the law and the literal import of the terms employed, however, the former, at least in connection with other elements has often been declared to prevail over the latter. In any case, a construction contrary to the general spirit of the statute is to be avoided, and that construction is favored which conforms to, and operates to carry out, the spirit of the statute. *See Am. Jr. 2d, Statutes* § 71. Unless a lower court has made a clearly erroneous interpretation or there is an abuse of discretion, an appellate court will adopt the lower court's interpretation of a rule of court that is clear and precise. *Straff v. Nationwide Mutual Ins. Co.*, 326 A.2d 586 (Pa. Super. 1974).

In ascertaining the intention of the Supreme Court in the promulgation of a rule, the courts may be guided by the following presumptions among others:

(a) That the Supreme Court does not intend a result that is absurd, impossible of execution, or unreasonable. *Pa. R.C.P. No. 128(a).*

The comment section following *Pa. R.C.P. No.1905(e)* provides guidance in determining the intent of the Supreme Court and the spirit of the rule:

The use of standardized forms provides uniformity and **is critical to the enforcement of protection orders** both inside and outside of Pennsylvania. These forms are based substantially on those proposed by members of the Pennsylvania Coalition Against Domestic Violence and have been further refined to accommodate the litigants' need for simplicity, the court's need for flexibility, and the law enforcement's need for certain identifying information necessary to enforce the protection order. The forms must be used so that all protection orders can be properly registered with the statewide PFA registry and the federal Protection Order File ("POF") established by the National Crime Information Center ("NCIC") for the collection of protection orders necessary for nationwide enforcement of protection orders. To this end, the forms capture all of the information that is required for data entry and the form orders are further structured to present that information in the order and sequence that is most helpful to the various law enforcement agencies responsible for entering the information into the files.

*Civil Procedural Rules Committee Explanatory Note to Pa. R.C.P. No. 1905(e).*

Upon review of the *Explanatory Note to Pa. R.C.P. 1905(e)* cited in the above paragraph, it is clear that the language contained in *Pa. R.C.P. No. 1905(e),* which specifically states that "the first page must be exactly as set forth in this rule" is written as such for the purposes of **enforcement** of protection orders, and not for

the **validation** of protection orders. This Court did not agree with Wife's contention that the failure to attach a form should lead to the invalidation of a protection order that has been in effect for approximately two (2) years. Had this Court invalidated the Stipulated PFA Order, as requested by Wife, this Court would have effectuated an absurd result contrary to *Pa. R.C.P. No. 128(a)*, and more importantly, this Court would create a dangerous precedent by which otherwise valid agreements entered into by parties to resolve domestic violence matters could be voided years afterward due to the failure to attach a form, the intent of which was not relevant to the agreed terms.

3. **Did this Court err in finding the testimony of Plaintiff and Plaintiff's witnesses credible?**

To the extent that Wife's argument challenges the credibility of Husband's testimony, and the testimony of his witnesses, such claim constitutes a challenge to the weight of the evidence. A challenge to the weight of the evidence must be raised with the trial judge in a motion for a new trial. *Pa. R. Crim. P. 607(A)*. In the instant matter, Wife did not preserve a weight claim as required by *Pa. R. Crim. P. 607(A)*, and, therefore, any such claim must be deemed waived. *See Commonwealth v. Walsh*, 36 A.3d 613, 622 (Pa. Super. 2012) (finding waiver under *Pa. R. Crim. P. 607(A)* where appellant's motion for new trial following conviction of indirect criminal contempt did not include weight claim).

In matter relating to order for protection from abuse, Superior Court defers to credibility determinations of trial court as to witnesses who appeared before it. *Hood O'Hara v. Wills*, 873 A.2d 757, 759 (Pa. Super. 2005). Specifically, this Court found Husband's testimony credible with respect to his observations of Wife as she entered the chapel, smiled, and made a "hand gesture" at him. Wife's entry into the chapel was observed by security officer Mike Balsama, who testified credibly that he attempted to instruct Wife not to enter the chapel, and used the Spanish translator to convey that information to Wife. Spanish translator Dr. Jay testified credibly that she translated Mr. Balsama's instructions to Wife, and that Wife, who was not facing the chapel, "did a 180 degree turn" and entered the chapel as soon as she heard that Husband was inside and was instructed not to enter the chapel. This Court did not find Wife to be credible when she testified that she did not hear the instructions of Mr. Balsama and Dr. Jay, and that she ran into the chapel to "escape the harassment of [Husband's] security team."

**4. Did this Court err in finding Appellant guilty of indirect criminal contempt instead of indirect civil contempt when the violation was de minimis?**

There is nothing inherent in a contemptuous act or refusal to act which classifies that act as 'criminal' or 'civil'. The distinction between criminal and civil contempt is rather a distinction between two permissible judicial responses to contumacious behavior. *Diamond v. Diamond*, 715 A.2d 1190, 1194 (Pa. Super. 1998). To distinguish between civil and criminal contempt, the dominant purpose

and objective of the court's order must be looked to as the controlling factor. The adjudication of contempt is civil if the dominant purpose of a contempt proceeding is to prospectively coerce the contemnor to comply with a lawful Court Order. *West Pittston Borough v. LIW Investments, Inc.,* 119 A.3d 415 (Pa. Commw. Ct. 2015); *Stewart v. Foxworth,* 65 A.3d 468 (2013); *Childress v. Bogosian,* 12 A.3d 448 (2011). If, however, the dominant purpose is to punish the contemnor for disobedience of the court's order or some other contemptuous act, the adjudication of contempt is criminal. *Diamond,* 715 A.2d at 1194. Dominant purpose of coercion or punishment is expressed in the sanction imposed. A civil adjudication of contempt coerces with a conditional or indeterminate sentence of which the contemnor may relieve himself by obeying the court's order, while a criminal adjudication of contempt punishes with a certain time of imprisonment or a fine which the contemnor is powerless to escape by compliance. *Id.* Stated simply, in a civil contempt order the contemnor is able to purge himself of the contempt and thus holds the keys to the jailhouse door. *Id. See, e.g., Colbert v. Gunning,* 368 Pa. Super. 28, 29–31, 533 A.2d 471, 472 (1987); *Markey v. Marino,* 361 Pa.Super. 92, 96–98, 521 A.2d 942, 945 (1987), *alloc. denied,* 516 Pa. 614, 531 A.2d 781 (1987); *Knaus v. Knaus,* 387 Pa. 370, 379, 127 A.2d 669, 673 (1956).

Proceedings to enforce compliance with a court order are civil in nature if the purported act of contempt is a refusal to do (or refrain from doing) some act that

was ordered or prohibited primarily for the benefit of a private party. *In re Contempt of Cullen*, 849 A.2d 1207 (2004); *Com. v. Ashton*, 2003 PA Super 194, 824 A.2d 1198 (2003). In Protection from Abuse matters, civil contempt is a remedy that may be utilized for the benefit of a private party pursuant to *23 Pa. C.S. § 6114.1*, which provides as follows:

§ *6114.1*. Civil contempt or modification for violation of an order or agreement:

(a) General rule.—A plaintiff may file a petition for civil contempt with the issuing court alleging that the defendant has violated any provision of an order or court-approved agreement issued under this chapter or a foreign protection order.

(b) Civil contempt order.—Upon finding of a violation of a protection order or court approved consent agreement issued under this chapter or a foreign protection order, the court, either pursuant to petition for civil contempt or on its own accord, may hold the defendant in civil contempt and constrain him in accordance with law.

For example, a provision in a protection from abuse order which requires a Defendant to return items of personal property to a Plaintiff may be enforced by a Petition for Civil Contempt. *See e.g. Gerace v. Gerace*, 631 A.2d 1360 (Pa. Super. 1993). The indirect criminal contempt action, however, is criminal in nature and seeks to punish violations of the protective order. *Commonwealth v. Nelson*, 690 A.2d 728 (Pa. Super. 1997). Indirect criminal contempt for violation of protection from abuse orders or agreements is prescribed under *23 Pa. C.S. § 6114 (a)*, which states the following:

(a)     General rule.—Where the police, sheriff or the plaintiff have filed charges **of indirect criminal contempt** against a defendant for violation of a protection order issued under this chapter, a foreign protection order or a court-approved consent agreement, the court may hold the defendant in indirect criminal contempt and punish the defendant in accordance with law.

*23 Pa. C.S. § 6114(a)* (Emphasis added).

Where a PFA order is involved, an indirect criminal contempt charge is designed to seek punishment for violation of the protective order. *Commonwealth v. Brumbaugh*, 932 A.2d 108, 110 (Pa. Super. 2007). In *Brumbaugh*, Defendant was sentenced to a Three Hundred Dollar ($300.00) fine and probation due to violation of a "no contact provision" of a protection from abuse order. Defendant's violation of the "no contact provision" occurred when the victim contacted him and asked him to attend a birthday party with her. The Defendant agreed and attended the birthday party with the victim. The Superior Court affirmed the Trial Court's finding of indirect criminal contempt based on the determination that Defendant's act constituting the violation of the PFA Order was clearly volitional, or knowingly made, and that wrongful intent could be imputed by virtue of the substantial certainty that by choosing to accept the victim's invitation to travel with her in the same vehicle to a party, he would be in contact with her in violation of the PFA Order.

In the instant matter, as in *Brumbaugh*, the Stipulated PFA Order at issue clearly prohibited Wife "from having any contact...either directly or indirectly"

with Husband. Wife had notice of this Order after consenting to it in writing. *See Stipulated PFA Order; See also Brumbaugh,* 932 A.2d at 110. Similar to the Defendant in *Brumbaugh,* Wife violated the "no contact provision" of a PFA Order. Proceedings were initiated by the Commonwealth of Pennsylvania by way of a Complaint for Indirect Criminal Contempt. The dominant purpose in the adjudication of this matter was to punish Wife for disobedience of the Stipulated PFA Order. This Court applied the elements prescribed under the *Brumbaugh* and *Ashton* cases to determine that Wife was guilty of Indirect Criminal Contempt.

## CONCLUSION

For the above stated reasons this Court's September 5, 2017 Order finding Wife guilty of indirect criminal contempt should be affirmed.

BY THE COURT:

_____
Dominic F. Pileggi, J.